Barbara Jean BERRY et al., Plaintiffs,

v.

SCHOOL DISTRICT OF the CITY OF
BENTON HARBOR et al.,
Defendants.

No. C.A. 9.

United States District Court,
W. D. Michigan, S. D.

Aug. 22, 1977.

Louis R. Lucas, Elijah Noel, Jr., Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Roxbury, Mass., John A. Dziamba, Willimantic, Conn., Stuart J. Dunnings, Jr., Dunnings & Gibson, Lansing, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP Special Contribution Fund, New York City, for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Roccy M. DeFrancesco, Adams & DeFrancesco, St. Joseph, Mich., for Benton Harbor School Bd.

John L. Crow, Francis A. Jones, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Clair School Dist.

George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Craig Atchison, Asst. Atty. Gen., Lansing, Mich., for State of Mich. Boundary Commission.

E. Michael Stafford, Farhat, Burns & Story, Lansing, Mich., for Coloma School Dist.

Lee Boothby, Boothby & Huff, Berrien Springs, Mich., for Sodus Tp./Fellner Group.

Andrew J. Burch, Coloma, Mich., for intervening defendants Baldwin and Concerned Parents of Hagar Tp. School Dist. No. 4.

Thomas J. Nordberg, Lansing, Mich., for Berrien County Intermediate School Dist.

## OPINION

FOX, Chief Judge.

Nearly ten years after filing this action, and over seven years after having established a prima facie case that the schools attended by plaintiffs, and the class of persons they seek to represent, are products of de jure segregation, plaintiffs remain contained in segregated schools under conditions no better, and in many cases considerably worse, than when this litigation was initiated. After a careful and searching examination of the evidence presented at trial, and of the record established at the previous trial before Judge W. Wallace Kent, I conclude that defendant, Benton Harbor Area School District, has failed to rebut the prima facie case of de jure segregation established against it. That is, plaintiffs have shown action or inaction by public officials, with a segregative purpose and intent, which actually resulted in increased or continued segregation in the public schools of Benton Harbor.

When matters of great public and constitutional significance come here for resolution, this court assumes an extra duty of care in explaining the reasons for its decision. As always, the court states the factual basis and the legal standards on which its conclusion rests so that counsel for the parties, and the appellate court, will know the legal grounds for this court's decision. Equally important, however, this court as-

sumes also an affirmative obligation to attempt to educate the public concerning the basic principles underlying our constitutional democracy and the practical application of these principles in our public affairs. Since the present school desegregation case is of such importance to the people of Benton Harbor and the State of Michigan, this court has gone to great lengths to detail the facts and explain the basic constitutional principles which led the court to its conclusion.

I am well aware that many people are unfamiliar with and distressed by the law of the land which requires that school desegregation decisions, involving the education of our precious children, must often be made by a single judge rather than by other governmental officials or the voters. The real reason that courts are active in school desegregation matters, however, is the failure of other governmental entities to confront and produce answers to the many problems in this area pursuant to the Constitution and laws of the United States. This court is quick to admit that the litigation model is not the most efficient way to solve problems of far-reaching social impact, but our courts must always protect the constitutional rights of all our citizens.

## I. Procedural Background of the Case.

The original complaint in this action was filed on November 16, 1967. In the complaint, plaintiffs Berry, et al., black children attending the public schools of Benton Harbor, Michigan, and their parents sued the School District of the City of Benton Harbor, the members of that Board, and the Superintendent of the School District. Among other relief, the complaint sought preliminary and permanent injunctive relief to:

". . . restrain the defendants named herein from continuing to maintain racially-segregated, educationally and psychologically detrimental schools, making additions to such schools, thereby aggravating segregated, harmful conditions, and building new schools which will be segregated and harmful, from dispens-

ing educational goods and services in a racially-discriminatory manner, from continuing to inflict and cause harm to black pupils by use of Board procedures and policies, and from compelling attendance at institutions which are educationally and psychologically detrimental to black pupils." Plaintiffs' Complaint at ¶ 2.

The complaint covered a broad spectrum of practices by the defendants which plaintiffs deemed to be discriminatory or segregative.

After extensive discovery, trial was held in February 1970, before the late Judge W. Wallace Kent. In findings of fact and conclusions of law announced by Judge Kent in July 1971, the court found several practices carried out by defendants to be discriminatory, among them assignment of teaching positions by race and the "tracking system" at defendants' junior high schools. Judge Kent, however, concluded that the racial imbalance in the Benton Harbor public schools was not the result of de jure segregation, as he interpreted the existing case law.

In an opinion delivered November 1, 1974, the Court of Appeals, ruling upon the appeal of defendants and the cross-appeal of plaintiffs, affirmed the District Court's determination that the above-listed practices were discriminatory. *Berry v. School District of City of Benton Harbor*, 505 F.2d 238 (6th Cir. 1974). The Court of Appeals, however, determined that a prima facie case of de jure segregation had been made out by plaintiffs:

"It is clear from a recital of the facts of record in this case that a number of important indicia of de jure segregation were present even though a dual school system was neither compelled nor authorized by law. The school system was in fact racially imbalanced, teachers were assigned on the basis of race, the physical condition of the predominantly black schools was generally inferior to the conditions in the predominantly white schools, and the method of assigning students to learning groups in the black junior high school deprived black students of an equal opportunity for an edu-

cation. The Supreme Court has stated that discrimination in these areas of education constitutes a prima facie case of the existence of a dual school system. *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).[4] We are satisfied

[4] The six criteria most often listed as indicia are composition of the student bodies, faculty, staff, transportation, extra-curricular activities, and facilities.

that a prima facie case was made out in this instance.

"We recognize the difficulty in determining the quantum of state participation which is a prerequisite to a finding of a constitutional violation. '[T]he necessary degree of state involvement is incapable of precise definition and must be defined on a case-by-case basis.' *United States v. Texas Education Agency,* 467 F.2d 848, 864 (5th Cir. 1972), cited with approval in *Keyes v. School District No. 1, Denver, Colorado,* supra, 413 U.S. at 215, 93 S.Ct. 2686 (Douglas, J., concurring). The district courts are not without guidance in this difficult task, however, as there have been a number of appellate decisions addressed to this problem. Although the relevant standards have not changed since Judge Kent rendered his decision in 1971, the Supreme Court has attempted to clarify the law in this area. For this reason, the issues presented by this case are particularly well suited to fresh consideration by the district court in light of recent case law. The question on remand will be whether defendants can successfully negate the prima facie case of de jure segregation that has been made against them."

Id. at 242.

Upon remand, the case was assigned to this Judge.

Previous to the decision in the Court of Appeals, plaintiffs filed, on August 21, 1974, a motion to add parties and an application for a temporary restraining order. The added defendants were the Michigan State Board of Education; John W. Porter as Superintendent of Public Education of the Board of Education of the State of Michigan; and the Boards of Education of the Eau Claire School District and the Coloma School District. The injunctive relief sought was to cancel the transfer to the Eau Claire School District (Sodus transfer) and to the Coloma School District (Eaman transfer) of portions of the Benton Harbor School District. These transferred areas were overwhelmingly populated by white students and the transfers were claimed to increase the alleged segregation of the Benton Harbor Schools. The Sodus and Eaman transfers were alleged to have been approved by Defendants Porter and the Michigan State Board of Education. As I noted in an opinion accompanying the preliminary injunction:

"The appropriate educational authorities did not seek leave from any federal court before carrying out the order of the State Board of Education, even though the Board's order alters the very subject of the suit—the Benton Harbor School District." Opinion Granting Preliminary Injunction, at 3.

Finding that the transfers would significantly affect the subject of the suit and concluding that the fact that the case was on appeal did not deprive this court of jurisdiction to promulgate additional orders to maintain the status quo, I granted the motion to add parties and granted injunctive relief against the implementation of the Eau Claire (Sodus) transfer. I also noted my concern that the transfers themselves could potentially be acts of segregation.

On January 8, 1975, the Sixth Circuit affirmed both the issuance of the above injunction and this court's order adding parties defendant. Subsequently, on September 18, 1975, plaintiffs filed a Motion for Leave to File Supplemental Complaint.

In addition to the original defendants to this suit and those added by order of this court in 1974, the Supplemental Complaint

sought to add the following defendants: William G. Milliken, Governor of the State of Michigan; Frank J. Kelley, Attorney General of the State of Michigan; the Municipal Boundary Commission of the State of Michigan; and the Berrien County Intermediate School District and its Superintendent, Raymond Sreboth. Governor Milliken, Attorney General Kelley, the State Boundary Commission, and the Berrien Intermediate School District, among other allegations, were claimed to be responsible for the attempted dismemberment of the Benton Harbor School District. It was also alleged that these additional defendants failed to take any affirmative action to halt the continuing trend of segregation in the Benton Harbor public schools.

In order to expedite matters in these lengthy proceedings, I ordered plaintiffs' Supplemental Complaint filed on September 25, 1975. Leave was given to the added defendants to file motions to strike the Supplemental Complaint. Various such motions were filed by the State defendants and Berrien County Intermediate Board. In an opinion entered May 27, 1977, these motions were denied.

In order to simplify trial proceedings, it was determined that the action would be heard in two parts. Phase I would be rebuttal by the Benton Harbor Area School District (BHASD) of the prima facie case of de jure segregation. On this phase, the defendant BHASD would have the burden of proof. Phase II would be tried at a later date and involve the added defendants and matters raised by the Supplemental Complaint, upon which all parties agree the plaintiffs have the burden of proof. However, because it is impossible to strictly delimit the proofs that are introduced in so broad and complex a case as this, the added defendants were advised that evidence might be introduced during Phase I that was also relevant as to the issues involved in Phase II. All of the added defendants were given the opportunity to be present during Phase I, to cross-examine witnesses, and make objection to the admissibility of evidence. The added defendants were also given a substantial amount of time after the conclusion of trial in Phase I to formalize and submit their objections to evidence pertaining to Phase II issues. This opinion, however, goes solely to the issue of liability of the Benton Harbor Area School District.

Trial of Phase I was begun on June 21, 1977 and was completed on June 24, 1977. At this point, I would like to congratulate attorneys for the plaintiffs, Mr. Thomas Atkins and Mr. Elijah Noel, and attorneys for the defendant, Benton Harbor School Board, Mr. John Tully and Mr. Rocky DeFrancesco, for the respect they showed each other and the court, and the spirit of cooperation exhibited by counsel in what sometimes have the tendency to be rather strained proceedings.

Upon the filing of the trial transcript the parties were given three weeks in which to submit Proposed Findings of Fact and Conclusions of Law. Oral argument was held on these Proposed Findings on August 16, 1977.

## II. Class Certification.

One final issue requires resolution before an examination of defendant BHASD's liability is begun. Plaintiffs filed a "Motion to Certify the Within as a Class Action" on April 13, 1977. Defendants object to the class action certification for two reasons: (1) untimeliness, that is, it was not filed "as soon as practicable after the commencement of the action." and (2) overbreadth, that is, that the named plaintiffs, black students in the Benton Harbor Schools and their next friends, are not representative of white students in the district (the class certification motion includes "all present and future students within the Benton Harbor School District").

This action has been treated by the court, and the parties, as a class action since the filing of the original complaint. Indeed, the opinion of Judge Kent issued at the conclusion of the 1970 trial recognized that plaintiffs sought relief on their own behalf and upon behalf of "members of their class." Findings of Fact and Conclusions of Law, at 1. It is implicit that the relief

granted there was on behalf of plaintiffs and the class they sought to represent. All that has been lacking in these proceedings is a formal certification of the class.

The Advisory Committee's Note to the 1966 amendment to Fed.R.Civ.P. 23 indicates that Rule 23(b)(2) is intended to function as an effective vehicle for the bringing of suits alleging racial discrimination. See, Reprint of Committee Note, 39 F.R.D. 98, 102. The requirements of Rule 23(a) need not be so stringently applied where a suit alleging racial discrimination has been brought:

"In most civil rights cases plaintiff seeks injunctive or declaratory relief that will halt a discriminatory practice or that will strike down a statute, rule or ordinance on the ground it is constitutionally offensive. Whether plaintiff proceeds as an individual or on a class suit basis, the requested relief generally will benefit not only the claimant but all other persons subject to the practice or rule under attack. A judicial determination that a law or practice infringes upon protected liberties and therefore is invalid will prevent its application against anyone, not simply the party before the court. Thus, even if plaintiff is not a proper representative in the traditional sense, striking a class claim will not effectively change the end result if the party successfully proceeds on an individual basis. . . . Moreover, as a practical matter, it is immaterial that some members of the class favor a particular ordinance and oppose the action or are antagonistic toward plaintiff. If a statute, ordinance, or practice violates constitutional limits it will be invalidated notwithstanding the fact that there are those who would like to have it upheld." 7 Wright & Miller, *Federal Practice* § 1771.

In light of these practicalities, and due to the notoriety of this case in the Benton Harbor area, members of the class have adequate notice. Certification of the class will not in any way delay the culmination of this litigation; nor will any party be prejudiced by certification at this time.

This is especially true in the present case where only declaratory and injunctive relief, not monetary damages, is sought.

It must be recognized that class certification now would have as its primary effect allaying the fears of plaintiffs that their case may be mooted by the graduation or transfer of all named plaintiffs out of defendant BHASD's schools. Now that this case has dragged on for nearly ten years, that fear is becoming a reality. Therefore, I find that this action is a proper class action and certify it as such pursuant to Rule 23. *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir. 1976). Plaintiffs designated this action as a class action in their initial complaint, before any determination of the merits. The responsibility to certify an action as a class action as soon as practicable after the commencement of an action rests upon the court, not the plaintiffs. *Senter,* supra, at 520–21. Plaintiffs' motion to certify this action as a class action is hereby granted.

*III. The Segregation Problem.*

The essence of plaintiffs' complaint in this case is an allegation of constitutional violations involving an inequity or inequality in public education deliberately created, maintained, and perpetuated by school officials. For reasons discussed in detail throughout this opinion, the court finds that the Benton Harbor schools have in fact been racially segregated and that these segregative conditions are being perpetuated even now. The court finds as a matter of demonstrable fact and established law that this condition of segregation resulted in inequitable and unequal educational opportunities for Black and White students. Educational inequity is a necessary consequence of racial discrimination in and separation of the schools. The reasons which explain this fact are complex, being intricately rooted in the tortured history of race relations of this nation. Over the years, Black experience has been unique in American history. No other racial or ethnic minority was systematically enslaved by the White majority. Rather than having suffered the temporary

discomfort and annoyance of social ostracism common to first-generation European ethnic groups, Blacks for hundreds of years were subjected to legally and socially institutionalized economic, spiritual, psychological, social and educational deprivation.

It is appropriate to note Gunnar Myrdal's observation on slavery in his classic, *An American Dilemma,* in his chapter on "Inequality of Justice:"

"Under slavery the Negro was owned, bought, and sold as property; he was worked, housed, fed, and prevented from doing what he wished if it was contrary to the interests of his master. In general, the Negro slave had no 'rights' which his owner was bound to respect. Even if in legal theory the slave was given the status of a person under the law as well as the status of property, it was the latter viewpoint which, in practice, became the determining one. In the very relationship between master and slave it was inherent that—without recourse to courts—force and bodily punishment and, under certain circumstances, even the killing of the slave was allowed. '. . . (A)ll slaveholders are under the shield of a perpetual license to murder,' exclaimed Hinton R. Helper in his unsparing onslaught on the plantation class and the slavery institution. Thomas Jefferson saw clearly the moral danger of the slavery institution:

'The whole commerce between master and slave is a perpetual exercise of the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other. Our children see this, and learn to imitate it. * * * The man must be a prodigy who can retain his manners and morals undepraved by such circumstances. *And with what execration should the statesman be loaded, who,* permitting one half the citizens to trample on the rights of the other, *transforming those into despots, and these into enemies, destroys the morals of one part, and the amor patriae of the other.* * * * [Can] the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that *these liberties are the gift of God*? That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that His justice cannot sleep forever.'" [1] (Emphasis supplied.)

Unfortunately, White attitudes originally attendant to the institution of slavery persisted after the adoption of the Thirteenth Amendment. Although legal slavery died, Americans created, during the four decades after the Civil War, a new legal and social pattern of discrimination based upon race. Many of these forms of institutionalized repression have persisted to the present, with the result that Black Americans are often denied the equality to which they are entitled in our constitutional democratic republic.

Inextricably intertwined with the dominating inescapable heritage of slavery and all its attendant dehumanizing ramifications, every aspect of the human condition of many Black people in America today is almost irremediably repressed. These continuing inhuman conditions of uncivilized servitude and inferior status have become known as vestiges of slavery.

The effects of this historical status of subservience and formalized inferiority continue to be pervasive. Past barriers to personal fulfillment and attainment cannot reasonably be minimized in assessing current impediments to equal opportunity. In the context of past officially sanctioned and present subtly insidious and invidious private and public racial discrimination against Black people as a class, a school environment which for whatever reason involves marked, disproportionate racial concentration inherently generates acute consciousness of race. As situated in segregated surroundings, this inflated consciousness triggers artificial, unrealistic personal reactions based on misconceived but, in view of

1. At 530–531 (1944).

historical predicates, *understandable individual perceptions of the significance of racial differences.*

Although disproportionate racial concentration of Black children in the schools might not have adverse consequences in all times and places, it certainly does in the context of the present forms of social organization, which are conditioned by legacy of slavery. One of the adverse effects of racial segregation is in the area of individual achievement.

Segregated Black children tend to infer that they are isolated from the White majority because of their race, and, drawing on their observations of the deprivations experienced by Black adults, they also tend to infer that their own potential is limited because of their race. It is not surprising that Black children have evidenced reduced self-esteem in a segregated environment and concomitant diminished motivation to succeed. The culturally-induced lack of self-esteem and diminished motivation in turn operate to measurably reduce achievement.

Individual growth in the educational system occurs not only in the area of achievement, the acquisition of cognitive skills, but also in the areas of social and psychological development. Segregation is perhaps more detrimental to the Black student's social and psychological development than to his achievement level. Finding himself isolated to a significant degree from the bulk of the White population, witnessing the disparate superiority of the status of White adults over Black adults in many circumstances, and perhaps further observing a pronounced underrepresentation of Blacks in positions of leadership in his school, where this is the case, the Black child may become reluctant to assert himself in the presence of Whites and unduly pessimistic concerning his ability to interact or compete successfully with Whites of his own generation.[2]

Teacher reaction to segregated educational circumstances frequently operates to the disadvantage of students. Dubbed by some

researchers as a kind of "self-fulfilling prophecy," the impact on Black students or teacher expectations based on race has been demonstrated by several studies. Affected by racial stereotypes as well as by actual patterns of disparate Black-White performance levels in the general society, teachers may tend to "teach down" to Black children, expecting and therefore eliciting low levels of performance.

The negative impact of racially segregated schools is not confined exclusively to Black students. White students may also react to racial isolation in ways harmful to themselves. White pupils are apt to form an irrational attitude of *inherent superiority and are apt to develop an unrealistic concept of homogeneous society in which certain values enjoy universal acceptance.* Similarly, because of their cultural isolation, segregated White children *tend to lose sight of those fundamental values of our constitutional system which, while respecting individual differences, favor free access and social mobility to all persons regardless of race, creed, or national origin, and which thereby promote a healthy interchange among persons of different backgrounds.*

The state of mind fostered by racial and cultural isolation heightens racial conflicts and divisiveness in the country and thus adversely affects the domestic tranquility the Constitution was designed to promote. White students who have been educated in segregated public schools are thus ill-prepared to deal with the pluralistic society which actually exists in the adult world beyond the classroom.

In part because of segregated schools, as Charles E. Silberman has written:

"[T]he public schools are failing dismally in what has always been regarded as one of their primary tasks—in Horace Mann's phrase, to be *'the great equalizer of the conditions of men,'* facilitating the movement of the poor and disadvantaged into the mainstream of American economic and social life. Far from being *'the great equalizer,'* the schools help per-

2. U.S. Commission on Civil Rights, Racial Isolation in the Public Schools 114 (1967).

petuate the differences in conditions, or at the very least, do little to reduce them. *If the United States is to become a truly just and humane society, the schools will have to do an incomparably better job than they are now doing of educating youngsters from minority-group and lower-class homes."* [3] (Emphasis supplied.)

The subject of race in America and the consequences of racial segregation in the schools might be explored at much greater length. However, it clearly appears that in the context of modern America, segregated education is detrimental to both Black and White students, creating especially for Black students, psychological and social difficulties which have a substantial adverse impact on overall individual development. Segregated education plainly denies equal educational opportunity.

The findings made by the court in this case parallel those made by the United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [Brown I]. In addressing the precise issue of the effect of racial separation on grade and high school students the Supreme Court in *Brown* quoted with approval language from the District Court as follows:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated

school system." 347 U.S. at 494, 74 S.Ct. at 691. (Emphasis supplied.)

Although much may be said about the fact that *Brown* involved obvious and conspicuous state action separating Blacks and Whites by statute, with respect to the simple issue of whether racial separation fundamentally poses a situation of inequity, *Brown* was and is unequivocal. "Separate educational facilities are inherently unequal." 347 U.S. at 495, 74 S.Ct. at 692.

*IV. The Legal Standard of Intent.*

■ The Fourteenth Amendment of the United States Constitution declares, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." [4] The law is clear that official action at any hierarchical level which denies the plaintiffs equal protection of the laws is unconstitutional. *Ex parte Virginia,* 100 U.S. 339, 346–347, 25 L.Ed. 676 (1880). It is established that "under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience." [5] Members of local school boards as well as members of the State Board of Education and the Superintendent of Public Instruction are State officers, agents of the State in every official respect.

Before entering upon the duties of their respective offices, all are required by the Michigan Constitution of 1963, Art. II, Sec. 1, to take and subscribe to the following oath or affirmation: "I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of . . . according to the best of my ability." Each officer thus undertakes a personal and offi-

---

**3.** Quoted in Senate Select Committee on Equal Educational Opportunity, Toward Equal Education Opportunity, Sen.Rep. No. 92–000, 92nd Cong., 2d Sess., Part III. Inequality in Education 95 (1972).

**4.** Pertinent excerpts from Supreme Court cases interpreting the Fourteenth Amendment are included in Appendices, App. A.

**5.** *Bradley v. Milliken,* 484 F.2d 215 (6th Cir., 1973) (en banc). The analysis of State law concerning education in Michigan at 245–249, is adopted and incorporated by reference for the purposes of this opinion. App. B.

cial responsibility to abide by the Constitution of the United States and of Michigan.

The principal issue in this case is whether the defendant State officers have denied the plaintiffs equal protection of the laws.

As noted above, this case has been remanded to this court to determine "whether defendants can successfully negate the prima facie case of de jure segregation that has been made against them." However, it is helpful at this time to examine the legal standards this court is applying to determine if the defendants have successfully rebutted the case against them.

■ None of the parties argue against the proposition that plaintiffs must make out a case of de jure segregation to prevail. Although discriminatory effects of certain actions taken by defendants may be "indicia" of segregative intent, discriminatory effect alone does not rise to a constitutional violation. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); cf. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ As a first step toward resolving this issue, the court has had to ascertain the legal standards to be applied to determine whether the defendants have been guilty of de jure segregation.[6] Although not as fully refined as the common law torts, the major legal elements and conditioning factors of the constitutional tort of de jure segregation [7] are reasonably clear:

> "A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued

segregation in the public schools." *Oliver,* supra, footnote, 508 F.2d at 182.

■ Ascertaining the Board's intentions is certainly difficult, but it is not at all impossible. The starting place is the standards and processes evolved by the common law for determining the relevant state of mind of the defendant, or defendants, in an intentional tort suit. The Supreme Court and the Sixth Circuit Court of Appeals have said that one of the Congressional statutes relied upon by the plaintiffs in this case, 42 U.S.C. Section 1983, should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961); *Pierson v. Ray,* 386 U.S. 547, 556, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Puckett v. Cox,* 456 F.2d 233, 235 (6th Cir. 1972); see *Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir. 1972). In general, it is reasonable to infer that people intend the natural and probable consequences of acts knowingly done or knowingly omitted. Thus, in a case tried to a jury, it would be proper to instruct that:

> "[Y]ou may infer a person's intent from surrounding circumstances. You may consider any statement made or act done or omitted by a party whose intent is in issue, and all other facts and circumstances which indicate his state of mind.
>
> "You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." [8]

Since intent may be proved by direct, indirect, or circumstantial evidence, all the facts and circumstances in evidence in the

---

**6.** The analysis of the court in this regard closely parallel its previous treatment of the issue in *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143 (D.C.Mich.1973), aff'd. sub nom. *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974), cert. denied 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

**7.** While the substantive requirements of the constitutional tort are derived from the Fourteenth Amendment and to a lesser extent from various implementation of statutes, this court has jurisdiction by virtue of several jurisdictional statutes passed by Congress.

**8.** 3 Devitt and Blackmar, Federal Jury Practice and Instructions, § 81.03 (2d Ed. 1977).

case which may aid in the determination of state of mind may be considered.[9]

In the recent case of *Bronson v. Board of Education,* 525 F.2d 344 (6th Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175, the Sixth Circuit confirmed the course set in *Oliver* and further elucidated the meaning of the intent requirement:

"In *Keyes,* the Court emphasized that the 'differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate.' 413 U.S. at 208, 93 S.Ct. [2686] at 2697. (emphasis in original). . . . (T)he Supreme Court appears to have held that intent is synonymous with purpose in determining whether a racial imbalance which is found to exist in a school system that was never segregated by state law results in a constitutional violation. In a school system which was previously segregated by state law there is no requirement that intent be shown. The state action requirement of the Fourteenth Amendment is not an issue. On the other hand, in a school system which has never been operated under a state requirement of separation of the races, *de facto* segregation may only be treated as resulting from state action in violation of the Fourteenth Amendment if it is shown to result from intentional acts, omission or policies of public officials or public bodies. . . .

"(A) court may infer intent, which is a subjective fact not easily proven, from evidence of racial imbalance accompanied by acts or omissions of a school board, the natural and probable result of which is to produce or perpetuate a segregated school system." (Citing *Oliver,* supra, and *Berry v. Benton Harbor School District,* 505 F.2d 238 (6 Cir. 1975)). *Bronson,* p. 348.

Under *Keyes,* in an intentional case, to be guilty of a constitutional violation, the state and/or local authorities must have in fact

caused or maintained the segregated conditions which are complained of. Under this theory, it is a complete defense that the authorities have not at all caused or maintained these conditions. Similarly, the defendants will not be held legally responsible if they have only occasionally committed segregative acts and these acts are of trivial importance and bear no significant relation to the modern situation.

■ Rather, the standard must be that the defendants to a substantial degree contributed to the creation or maintenance of segregated schooling in Benton Harbor. In a tort case, it would be proper to instruct the jury on the issue of proximate cause as follows:

"*An injury or damage is proximately caused by an act or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.*"[10] (Emphasis added.)

■ It is useful to note, as the Sixth Circuit did in *Oliver,* supra, at 182–183, that "(w)hen constitutional rights are involved, the issue is *seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive citizens of the equal protection of the laws. Rather, under the test for de jure segregation, the question is whether a purposeful pattern of segregation has manifested itself over time, despite the fact that individual official actions, considered alone, may not have been taken for segregative purposes and may not have been in themselves constitutionally invalid. Davis v. School District of Pontiac,* 443 F.2d 573, 576 (6th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). As the Supreme Court stated in *Wright v.*

9. Id.

10. 3 Devitt and Blackmar, supra, § 80.18. Of course, there might be more than one "proximate cause." See proposed jury instruction, Id., at § 80.19.

*Council of City of Emporia,* 407 U.S. 451, 461, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972), 'The "dominant purpose" test finds no precedent in our decisions.' " [11] (Emphasis added.) The record before the court in this case leads me to conclude that the collective will of the Benton Harbor School Board over the past years was, and continues to be, persistent, deeply rooted, pervasive, intentional segregation, which permeated the entire school system.

In a similar vein, the Second Circuit has observed:

". . . (W)e believe that a finding of de jure segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. * * * .

"To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible of proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. See *Palmer v. Thompson,* 403 U.S. 217, 224–25, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); and see *Keyes v. School District No. 1,* supra, 413 U.S. at 233–34, 93 S.Ct. 2686 (Powell, J., concurring). It is even harder to find the motivation of local citizens, many of whom *would be as reluctant to admit that they*

have racial prejudice as to admit that they have no sense of humor.

\* \* \* \* \* \*

"Speaking in de jure terms does not require us, then, to *limit the state activity which effectively spells segregation only to acts which are provably motivated by a desire to discriminate.* * * * Aside from the difficulties of ferreting out a collective motive and conversely the injustice of ascribing collective will to articulate remarks of particular bigots, *the nature of the 'state action' takes its quality from its foreseeable effect. The Fourteenth Amendment is not meant to assess blame but to prevent injustice.*" (Emphasis supplied.) *Hart v. Community School Board of Education, N. Y. School Dist. No. 21,* 512 F.2d 37, 50 (2nd Cir. 1975), cited in *U. S. v. School District of Omaha,* 521 F.2d 530 (8th Cir., 1975). Cf. *Oliver,* supra.

In *Washington v. Davis,* the Supreme Court admitted that "[n]ecessarily, an invidiously discriminatory purpose may often be inferred from the totality of relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. . . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 242, 96 S.Ct. at 2049. The majority's reference to the necessity of proving segregative intent from the totality of the circumstances was amplified by Justice Stevens in his concurring opinion:

---

11. The issue of "purpose" was clarified somewhat in the recent *Arlington Heights* decision, supra, 429 U.S. at 265, 97 S.Ct. at 563, 50 L.Ed.2d at 464–65:

"[*Washington v.*] *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irra-

tionality. But racial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified."

In a footnote, 429 U.S. at 271–272, 97 S.Ct. at 566, 50 L.Ed.2d at 468, the court noted that proof that the decision by the defendant was motivated in part by a racially discriminatory purpose would not necessarily require invalidation of the challenged action. It would, however, shift the burden of proof to the defendant to establish that the same action would have been taken even had the impermissible purpose not been considered. See *Mt. Healthy City School Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it."

In order to fairly assess the alleged actions and inactions of the defendants, and to determine what the foreseeable consequences of these acts and omissions were, it is necessary to consider the conditions existing when they occurred. To this end, the court has carefully evaluated all of the voluminous testimony and numerous exhibits put into evidence in this case since it began.

The Supreme Court in *Keyes, supra,* 413 U.S. at 196, 93 S.Ct. at 2691, stated: "What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of the faculty and staff and the community and administration attitudes toward the school must be taken into consideration." Previously the Court wrote:

"In *Green* [*Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)], we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435, [88 S.Ct. 1689, at 1692] Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554.

Based upon the fact that the plaintiffs had shown in the original trial of this action that the school system was in fact racially segregated, that teachers were assigned to schools on the basis of race, that the physical conditions of the predominantly Black schools were generally inferior to the conditions of predominantly White schools, and that the method of assigning students to learning groups in the Black junior high school deprived Black students of equal opportunity, the Court of Appeals found that the plaintiffs had made out such a prima facie case. This meant that the defendants had the burden of going forward with their proofs at the new trial. This shifting of the burden of proof upon a presentation of a prima facie case is commonplace judicial procedure, and its application in school desegregation cases is not novel.[12]

A presumption of segregative intent arises when plaintiffs establish that the natural, probable and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively es-

12. "This burden-shifting principle is not new or novel. There are no hard-and-fast standards governing allocation of the burden of proof in every situation. The issue, rather, 'is merely a question of policy and fairness based on experience in the different situations.' 9 J. Wigmore, Evidence § 2486, at 275 (3d ed. 1940). In the context of racial segregation in public educa-tion, the courts, including this Court, have recognized a variety of situations in which 'fairness' and 'policy' require state authorities to bear the burden of explaining actions or conditions which appear to be racially motivated. (Citation of cases omitted.)" *Keyes, supra,* 413 U.S. at 209, 93 S.Ct. at 2698.

tablish that their action or inaction was a consistent and resolute application of racially neutral policies. *Oliver,* supra, 508 F.2d at 182; *Keyes,* supra; *Bradley v. Milliken,* 484 F.2d 215 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Davis v. School District of Pontiac,* 443 F.2d 573 (6th Cir. 1971), aff'g. 309 F.Supp. 734 (E.D.Mich. 1970).

### V. Findings of Fact.

■ The recent case of *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 416, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), reaffirmed the already well-established principle in school desegregation cases that the scope of the remedy must be commensurate with the scope of the constitutional violation. In reversing a system-wide remedy ordered upon the basis of three isolated equal protection violations, the Court stated:

> "If such [constitutional] violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a system-wide impact may there be a system-wide remedy." Id. at 420, 97 S.Ct. at 2775.

Therefore, although this opinion goes only to the question of liability of defendant Benton Harbor Area Schools, any remedy ordered must be based upon clear discriminatory violations shown and the extent of the impact of these violations upon present conditions in the Benton Harbor Area public schools. This, in turn, requires a careful examination of the record made before Judge Kent and his Findings of Fact, based

upon the situation in 1970, and the present situation within the defendant's schools. Such an examination is necessary to determine whether the defendant has rebutted the prima facie case of de jure segregation against it, whether subsequent actions taken by defendant have remedied the effects of previous segregative acts, and what the scope of any court-imposed remedy should be.[13]

### A. The Record of the Original Proceedings.

Judge Kent concluded that the defendant had committed three violations of the equal protection clause: (1) assignment of teachers by race; (2) use of the "tracking" system at Benton Harbor Junior High (which involuntarily assigned Black students to generally lower achievement level groups from which it was difficult to escape); and (3) the per-student budgeting procedure which Judge Kent perceived as discriminatory against Black students in the older, identifiably Black schools. The Court of Appeals affirmed Judge Kent's order as to the "tracking" system and it has since been eliminated. The finding as to the per-student budgeting procedure was reversed on appeal. The finding as to assignment of teachers was also affirmed upon appeal.

Judge Kent, feeling bound by Sixth Circuit precedent,[14] felt he could not invalidate the defendant's neighborhood school policy. However, he went on to state for the record:

> "It would be possible to dwell at great length upon the testimony which has been offered and received in this courtroom in the last two weeks and more in regard to this situation, but no purpose would be served by that; and the Court should say, therefore, that it is satisfied, based upon this record, that the neighborhood school system which is before this

---

13. For the convenience of the parties and the reader, attached to this opinion as Appendix D, is a glossary of terms, defined as applied in this opinion.

14. Citing *Goss v. Board of Education of the City of Knoxville,* 406 F.2d 1183 (6th Cir. 1969) and *Deal v. Cincinnati Board of Education,* 419 F.2d 1387 (6th Cir. 1969).

Court necessarily results in the denial of equal opportunity for education to the black child who is forced because of other circumstances to attend a predominantly black school." Bench Opinion at 17.

As noted above, the Sixth Circuit Court of Appeals, finding certain indicia of de jure segregation, reversed the District Court's finding of no dual school system and remanded the issue for "fresh consideration" by this Court in light of recent case law. I will attempt to follow as closely as possible the Findings of Fact made by Judge Kent. However, because Judge Kent felt the case law at that time prevented him from finding de jure segregation, despite his own predisposition to do so (as indicated by the above excerpt from his Bench Opinion), there are perhaps many Findings of Fact which Judge Kent may have made if he had felt it was permissible for him to conclude there was a dual system under the facts of this case. I have, therefore, made a complete examination of the record established before Judge Kent and make the following Findings of Fact based upon that record.

I will first make a short examination of the history of the Benton Harbor public schools. I will then examine the indicia of de jure segregation pointed out \ by the Court of Appeals' opinion and also examine any other indicia of de jure segregation, e. g., intact busing, transfer policies, which may be present in the original record.

### (1) History of the Benton Harbor Area School District.

The Benton Harbor Area School District (BHASD) [15] was established on June 17, 1965, by the consolidation of the School District of the City of Benton Harbor, with fifteen neighboring and previously separate school districts. The consolidation was approved by a majority of voters in each district. Consolidation occurred under the impetus of a (then) recently enacted Michigan statute which made it desirable for independent districts, not providing high school education, to consolidate with districts providing the full range of K–12 (Kindergarten through twelfth grade) classes. [16] Subsequent to consolidation, two other independent districts were joined to BHASD, one by annexation (Eaman) [17] and the other by attachment (Martindale). [18] All of the districts joining the School District of the City of Benton Harbor had previously sent their high school-age students, on a tuition basis, to Benton Harbor High School. [19] An additional purpose of consolidation was to remedy the containment of Black students in the Benton Harbor city schools, and prevent the schools within the city limits of Benton Harbor from becoming all Black. [20]

At the time of consolidation, the districts joining, the number of schools in each district, the number of students in each school, and the percentage of Black students in each school were as follows: [21]

15. The defendant district is now apparently known by this name. Immediately after consolidation and for some time thereafter, the district was known as the School District of the City of Benton Harbor and is so named in the pleadings. Whether or not there has been a formal name change by the district is not clear. However, for clarity throughout this opinion, and to avoid confusion with the School District of the City of Benton Harbor as it existed before consolidation (i. e., within the city limits of the City of Benton Harbor), the defendant consolidated district will be referred to consistently throughout this opinion as Benton Harbor Area School District (BHASD). Unless noted, references to "defendant(s)" are references to BHASD.

16. See, M.C.L.A. § 340.431 et seq. and § 388.-681 et seq.

17. M.C.L.A. § 340.431 et seq.

18. M.C.L.A. § 340.3.

19. Testimony of Edward Troffer (Group Director, Operations and Facilities, BHASD; member, pre-consolidation study committee), Transcript of Remand Trial (R–Tr.) at 25.

20. Testimony of James Nettleton (Benton Harbor patent attorney; member of pre-consolidation study committee; former BHASD board member), R–Tr. 662.

21. The figures are based upon plaintiffs' Exhibit on Remand (PXR)–11 and –12, and Defendant's Exhibit on Remand (DXR)–D. All figures given are based upon the Fourth Friday count taken at the beginning of each school year.

| District | Number of School Buildings | | Number of Students | Percent Black |
|---|---|---|---|---|
| Benton Harbor | 7: | | | |
| | | Calvin Britain | 589 | 54.3 |
| | | Columbus | 262 | 19.1 |
| | | Morton | 702 | 89.7 |
| | | Seely McCord | 711 | 88.6 |
| | | Sterne Brunson | 501 | 6.6 |
| | | Benton Harbor Jr. H. | 932 | 56.3 |
| | | Benton Harbor H. S. | 2289 | 20.7 |
| Fairplain | 5: | | | |
| | | Fairplain East | 296 | 2.7 |
| | | Fairplain Northeast | 220 | 5.4 |
| | | Fairplain Northwest | 209 | 0.0 |
| | | Fairplain West | 322 | 0.0 |
| | | Fairplain Jr. H. | 585 | 3.2 |
| Stump [22] | 2: | | | |
| | | Stump Alma | 128 | 96.9 |
| | | Stump Nickerson | 91 | 32.9 |
| Bard | 1 | | 836 | 95.7 |
| Boynton | 1 | | 384 | 78.9 |
| Chadwick [23] | 1 | | 55 | 3.8 |
| Eaman | 1 | | 119 | 0.0 |
| Hull | 1 | | 801 | 47.1 |
| Johnson [24] | 1 | | 286 | 1.0 |
| Lafayette | 1 | | 231 | 1.3 |
| Martindale [25] | 1 | | 279 | 0.0 |
| Millburg [26] | 1 | | 178 | 2.8 |
| Mt. Pleasant [27] | 1 | | 36 | 8.3 |
| North Shore | 1 | | 122 | 5.7 |
| Pearl | 1 | | 163 | 0.6 |
| Sodus [28] | 1 | | 83 | 8.4 |
| Sorter | 1 | | 510 | 2.9 |
| Spinks Corner [29] | 1 | | 46 | 2.2 |

---

At the time of consolidation, BHASD was 37.3 percent Black. As of consolidation, only 2 of 29 schools in the new district (Hull and Stump Nickerson) were racially uniden- tifiable—the remaining 27 schools were racially identifiable as Black schools or as White schools. Additionally, in the year following consolidation (the first year of

22. The figures given are for the 1966–67 school year. The schools' totals were combined in reporting the 1965–66 school year and showed a total of 378 students, 44.9% of whom were Black, attending the two Stump schools.

23. No figures are available for the 1965–66 school year. Figures given are for the 1966–67 school year.

24. Figures given are for the 1966–67 school year.

25. Figures given are for the 1967–68 school year, Martindale's first full year in the district after attachment.

26. Figures given are for the 1966–67 school year.

27. Figures given are for the 1966–67 school year.

28. Figures given are for the 1966–67 school year.

29. Figures given are for the 1966–67 school year.

the new district for which relatively complete figures are available), 55.41 percent of the 4,223 Black elementary and junior high students attended schools that were 75–100 percent Black. At the same time, 67.06 percent of the 5,046 White elementary and junior high students attended schools that were 75–100 percent White.[30] The schools of the post-consolidation district were not racially identifiable solely on the basis of student population. As a rule, they were also racially identifiable upon the basis of the racial makeup of the faculty, building administrators and staff, physical facilities, recreational areas, and other characteristics.[31]

The racial composition of the schools in the consolidated system largely reflected the long-standing pattern of segregated housing in the Benton Harbor-St. Joseph area. As late as 1956, public housing in the City of Benton Harbor was officially segregated upon the basis of race.[32] The record shows at least two instances in which the predecessor districts of the present consolidated district took action relative to the public housing authorities which had the natural, probable, and foreseeable consequence of increasing the segregative conditions within their schools.

In the first instance, the City of Benton Harbor District and the Bard School District debated over which district would admit the children of Black residents of the

Fair Avenue housing project, constructed in early 1952 on the border between the two districts. The Fair Avenue project was a segregated Black housing project.[33] Although the land on which the project was built had been annexed to the City of Benton Harbor in 1951,[34] the area remained technically a portion of the Bard District until the Fall of 1952. In any case, the 65 Black students were refused entry at the beginning of the 1952–53 school year at both Bard School and at Seely McCord School—the closest city school.[35] After one week passed without school, the children were finally admitted to the Bard School.[36] At that time, Bard School was approximately 40 percent Black and Seely McCord School approximately 10 percent Black.[37] Although part of the motive over refusal to enroll was based upon a dispute over the implications of state annexation law, the inference is reasonable that the dispute would not have occurred except for the fact that neither district wished to have the additional 65 Black students in their district.

In the second instance, the Superintendent of the Bard District, in a letter to the Benton Harbor Housing Commission, approved the construction of a 200 unit, low-rent housing project within his district in 1960.[38] Although the Bard School was already seriously overcrowded, and the new project would add an estimated 140 stu-

30. PX–5 and PX–7.

31. See Part V(A)(2) and V(B), infra.

32. See, *Askew v. Benton Harbor Housing Commission, et al.,* C.A. 2512 (W.D.Mich.1956). In an opinion entered December 21, 1956, Judge Kent, relying upon *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and *Detroit Housing Commission v. Lewis,* 226 F.2d 180 (6th Cir. 1955), found that the defendants unlawfully discriminated against Blacks by operating one housing project for Blacks and another solely for Whites. The defendant was also found to have refused admission of qualified Black veterans to its veterans housing project solely upon the basis of race. A permanent injunction was entered enjoining such practices. The file in the *Askew* case was included in the record on appeal in this action.

33. *See* n. 32, supra; *see, also,* Testimony of Julia Joseph, R–Tr. 367.

34. PXR–90–A.

35. PXR–88–A through –88–E.

36. PXR–88–G.

37. Joseph testimony, R–Tr. 372. The children were not admitted to Seely McCord school until the second semester of the following year. *Id.*

38. PX–56. Assurances by school officials with regard to the availability of classroom space are apparently a prerequisite to federal funding of public housing. *See, Reed v. Rhodes,* 422 F.Supp. 708, 789 n. 18 (N.D.Ohio 1976).

dents to the school,[39] Superintendent Riemersma was not concerned because of a planned bond proposal to add eight rooms to the school. The additional rooms were never built.[40] The natural, probable, foreseeable and actual result of this approval of construction of a housing project which would be inhabited by Black residents, was to increase the segregation of a school that was already in excess of 80 percent Black.[41] As was stated in *Reed v. Rhodes*, supra, note 38:

> "It is clear that the presence of racially segregated public housing in connection with school board policies operated to spawn racially segregated schools. There can be little doubt that this result was the natural, probable, foreseeable, and actual effect of the school board's 'neighborhood school policy.'" Id. at 789.

It must be concluded, therefore, that the Bard officials intended the continued and increased segregation of the Bard School.

■ To say the least, defendant BHASD was racially segregated from the start. However, with the exception of the above incidents, there is a paucity of evidence that the predecessor districts were the products of intentional segregative acts. This does not mean that such was not the case. Far from it, for this court is left with the firm impression that there was pervasive and purposeful segregation in the predecessor districts. However, despite numerous requests from the plaintiffs for pre-consolidation records, and despite a Michigan statute requiring the consolidated district to receive the records of the predecessor districts,[42] defendant has consistently replied that no such records are available.[43] Therefore, plaintiffs' efforts to trace the present segregated conditions in the defendant's schools to intentional segregative acts of the component districts have largely been frustrated. These records are public documents and ought to be preserved and kept available. Where it would be natural under the circumstances for a party to introduce documents in his possession and he fails to do so, his failure may invoke an adverse inference. *N.L.R.B. v. Evans Packing Co.*, 463 F.2d 193 (6th Cir. 1972); II J. Wigmore, Evidence §§ 285, 291 (3d ed. 1940); 2 Devitt & Blackmar, Federal Jury Practice and Instructions § 72.17 (3d ed. 1977). The adverse inference which arises here is that these records of the predecessor districts would have shown that those districts were intentionally segregated and that the consolidated board was aware of those circumstances. This is another indicium of the segregative intent found to be present in the instant case. The court, however, has relied primarily on post-consolidation evidence obtained in these proceedings, and the finding of *de jure* segregation would stand alone on the basis of that evidence, and in the absence of such inference.

(2) *Indicia of De Jure Segregation.*

A. *Racial Segregation.*

■ While racial segregation itself is not sufficient to make out a case of de jure segregation, it is an indicium of de jure segregation which shifts the burden of proof as to segregative intent to the defendant. *Keyes v. School District No. 1,*

---

39. Id.

40. Schedule 73 in Defendant's Answers to Plaintiffs' Interrogatories, filed November 14, 1968, indicates the last addition to Bard was constructed in 1952.

41. PXR–2 at 2 indicates the school population in the 1960 census of the Benton Heights area of Benton Township was 80.5% Black. Benton Heights included Bard, Boynton, and Hull schools. In 1965, Bard was 95.7% Black, Boynton was 78.9% Black, and Hull was 47.1% Black. The implication, therefore, is that Bard school was far beyond 80% Black at the time it gave approval of the new housing project, even before the addition of these new Black students.

42. M.C.L.A. § 340.411; § 388.692. One BHASD official testified these records were in fact turned over to the consolidated district and were preserved and not destroyed. Troffer Testimony, R–Tr. 140–148.

43. The court makes no inference, and no inference can fairly be made, that defendant, or its present counsel, have in any way intentionally destroyed these records.

*Denver, Colorado,* 413 U.S. 189, 201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Berry v. School District of the City of Benton Harbor,* supra, 505 F.2d at 242. Defendants in this case have never denied that the schools of the defendant district are racially imbalanced. As noted above, the schools at the time of consolidation were highly segregated. This segregated condition had worsened by the time of trial before Judge Kent. The "fourth Friday" count for the 1969–70 school year indicates that 70.53 percent (3,353 of 4,754) of White elementary and junior high students were attending schools 75–100 percent White, an increase from 67.06 percent for the 1966–67 school year. The comparable figures for Black students showed a markedly sharper increase in segregation, with 77.12 percent (3,784 of 4,908) of Black elementary and junior high students attending schools 75–100 percent Black, up from 55.41 percent for the 1966–67 school year.[44]

In a school district that for the 1969–70 school year was 48.8 percent Black, five schools were more than 90 percent Black.[45] Three other schools were more than 80 percent Black.[46] Ten schools were more than 90 percent White.[47] Four others were more than 80 percent White.[48] With the exception of the high school, which all students in the district attend, the only schools in the system which were not racially identifiable were Columbus, Hull, and Sterne Brunson elementary schools.

*B. Teacher Assignment.*

Judge Kent made the following findings and conclusions with regard to the assignment of teaching faculty in the Benton Harbor public schools:

"At time of the trial Defendant district had fourteen schools have [sic] one hundred percent white faculties. It appears that in the 1966–67 school year, 68.09% of all black elementary and junior high teachers were assigned to schools with a 75% or more black enrollment. For the 1969–70 school year, the percentage rose to 84.62%, an increase of 16.53%. For white elementary and junior high teachers, the percentage in the 1966–67 school year was 44.27% assigned to schools with a white enrollment of 75% or more. For the 1969–70 school year the percentage was 50.34%, an increase of 6.07%.

\* \* \* \* \* \*

It appears . . . to the satisfaction of the Court that there is an unconstitutional assignment of teachers by race. We cannot assume that the fourteen schools which have one hundred percent white faculties, most of which are elementary schools or have elementary school facilities, did not have vacancies at the time that certain of the witnesses were employed by the Benton Harbor School system; more specifically, Mrs. Inez Waddell, Miss Dorothy Jefferson and Miss Bertha Jenkins, each of whom testified without contradiction that they were not afforded an opportunity to obtain employment in white schools, thus it appears that they were assigned to black schools because they were black, which by all standards, is unconstitutional. *Monroe v. Board of Commissioners of the City of Jackson,* [6 Cir.,] 380 F.2d 955."

44. PX–6 and PX–8. See 1966–67 figures, supra, at 23–24.

45. PX–4. Black enrollment was 99.3% at Bard, 97.3% at Morton, 95.4% at Morton Annex, and 95.0% at Seely McCord—all elementary schools. Black enrollment at Pioneer School, the "street academy," was 93.3%.

46. *Id.* Black enrollment was 81.7% at Benton Harbor Junior High and 84.6% at Boynton and 83.2% at Calvin Britain—both elementary schools.

47. *Id.* The ten, all elementary schools, had Black enrollments as follows: Eaman: 6.4%, Fairplain Northwest: 3.9%, Johnson: 4.7%, Lafayette: 5.4%, Martindale: 1.9%, Millburg: 0.0%, North Shore: 7.6%, Pearl: 4.4%, Sorter: 6.6%, and Spinks Corner: 0.0%.

48. *Id.* The four were Fairplain Junior High, 12.7% Black, and three elementary schools that had Black enrollments as follows: Fairplain East: 16.1%, Fairplain Northwest: 13.9%, and Fairplain West: 17.7%.

Judge Kent ordered defendant to cease from assigning teachers upon the basis of race. This order was affirmed by the Court of Appeals and is not at issue here. This finding must, however, be considered as part of the cumulative evidence of the constitutional violation present here. Because assignment of teachers upon the basis of race adds to the racial identifiability of a school, it may hasten the increased segregation of that school or help to preserve it in a segregated state. As was stated in *Keyes,* supra, 413 U.S. at 202, 93 S.Ct. at 2694:

> "[T]he assignment of faculty and staff, on racially identifiable bases, [has] the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools."

Therefore, to more fully understand the impact this policy of assignment of teachers upon the basis of race has had and continues to have upon defendant's schools, a closer examination of the teacher assignment policies at the time of the 1970 trial is warranted.

In the 1966–67 school year, only 51 of 468.8 teachers, or 10.9 percent, in the district were Black.[49] By the 1969–70 school year, the number of Black teachers was 83 out of a total of 460 teachers in the system, or 17.8 percent.[50] As noted in Judge Kent's Findings, the concentration of Black teachers in highly segregated Black schools increased sharply during this period. A closer examination of the figures makes the policy of assignment of teachers upon the basis of race clear. Of the fourteen schools 0–25 percent Black, only two schools, Pearl and Lafayette, had Black teachers and each of these schools had only one Black teacher.[51] That is, of a total number of 150 teachers in these 75–100 percent White schools, only two teachers, or 1.3 percent, were Black. Of a total of 160 teachers in 75–100 percent Black schools, 66, or 41.25 percent, were Black.[52]

The evidence as to the assignment of teaching staff can be rationally attributed only to a deliberate and conscious desire to create or to perpetuate a segregated condition in these schools. As to this evidence, there was, and is, no need to resort to the inferring of intent from effect, although such an inference would be entirely permissible. The requisite intent sufficient to find de jure segregation was clearly and independently established. This practice was in fact found by Judge Kent to deny plaintiffs equal protection of the law, a finding affirmed by the Court of Appeals. The practice of segregating the teaching staffs of the Benton Harbor system permeated defendant's entire system. This policy, undertaken with segregative intent, not only hastened the segregation of the identifiably Black schools,[53] it had other, more subtle, detrimental impacts upon plaintiffs and the class of students they represent.

The policy of assigning Black teachers, many of them newly hired and freshly out of school, to identifiably Black schools, coupled with the collective bargaining agreement which permitted the more experienced teachers to transfer out of the Black schools to preferred positions in White

---

49. See PXR–13. Fractions represent part-time and special class teachers.

50. *Id.* Figures from the exhibits offered at the Trial on Remand are used because PX–21 and –22, upon which Judge Kent based his findings, did not include teachers at the senior high level. The figure given does not include the four teachers in the preschool program, all of whom were White.

51. PX–36.

52. *Id.* The policy of racial assignment is made graphically clear in PX–19 and –20. *See, also,* PX–21A and PX–22–2.

53. All of the schools that were identifiably Black upon the basis of teaching staffs in 1969–70 were, by the 1976–77 school year, for all practical purposes, entirely Black schools. That is, the enrollment at these schools ranges from 97.5–100% Black. PXR–12.

schools,[54] resulted in the students in identifiably Black schools being taught by a higher percentage of teachers without degrees (i. e., possessing a "90-day" certificate or other temporary certification) or without prior teaching experience.[55] For instance, for the 1968–69 school year, while the 75–100 percent Black schools were staffed by 37.11 percent of the system's teachers, over 70 percent of the system's teachers without degrees were assigned to them.[56] Identifiably White schools, having 42.14 percent of the system's teachers, had only 11.76 percent of the system's teachers without degrees. In a system averaging 5.35 percent teachers without degrees, 10.17 percent of teachers at Black schools were without degrees as opposed to only 1.49 percent at White schools.[57] Comparable figures appear in the record for teachers without prior experience.

Following from the fact that the teachers assigned to identifiably Black schools were less qualified and had less experience, the teaching salaries at identifiably Black schools were significantly lower than in the identifiably White schools.[58] Consequently, the per pupil expenditure for teacher salaries was lower in Black schools than in White schools.[59] These lower-paid, less-qualified and less-experienced teachers in 75–100 percent Black schools were also burdened with a higher pupil-teacher ratio than in 75–100 percent White schools.[60] Finally, there was a consistently higher percentage of teacher absences at 75–100 percent Black schools.[61]

The sum result of this discriminatory teacher assignment policy was that Black students contained in identifiably Black schools, who admittedly had the greatest need for well-trained, highly experienced teachers,[62] suffered further educational deprivation due to the higher percentage of undertrained and inexperienced teachers assigned to their schools. There were, of course, many highly competent, highly motivated teachers with years of teaching experience in the identifiably Black schools,[63] but it goes without saying that they could not fully compensate for the higher percentage of underqualified teachers at these schools. In addition, as I noted in the opening paragraphs of this opinion,[64] White students are also deprived by segregation of the opportunity to be taught in a school somewhat reflective of the larger, heterogeneous society about them. From the record in this case, it is apparent that many White students in defendant's schools were also deprived of the opportunity of being taught by many excellent teachers, solely upon the basis that the students were White and the teachers were Black.

## C. Physical Conditions.

Unequal school facilities are another indicium of de jure segregation. *Keyes,* supra, 413 U.S. at 210, 93 S.Ct. at 2698, 37 L.Ed.2d at 559; *Swann,* supra, 402 U.S. at 18, 91 S.Ct. at 1277, 28 L.Ed.2d at 568; *Berry,* supra, 505 F.2d at 242. In this case, it is possible, independent of student assignment, to identify "White" schools and "Black" schools simply by reference to the quality of school facilities and equipment. This makes up part of plaintiffs' prima facie case of intentional segregation.

54. *See* Judge Kent's Findings of Fact, Nos. 35–44. Cf. Separate transcript of testimony of Robert Payne, at 147–155.

55. *See,* PX-28 through PX-33.

56. PX-32.

57. PX-33.

58. *See,* PX-16, which compares average teacher salaries at schools 50–100 percent Black and 50–100 percent White. *See* graphs of those figures, PX-16A through -16D.

59. *See,* PX-9 through -13 and PX-23. *See,* graph, PX-23D.

60. PX-37.

61. *See,* PX-24 through -27.

62. Payne Testimony. Separate Tr. 155.

63. *See* the testimony of witnesses Inez Waddell, Dorothy Jefferson, and Bertha Jenkins, Transcript of Original Trial.

64. *Supra,* Part III at 12.

At the beginning of the 1969–70 school year, the median age of the seven schools 50 percent or more Black was 43 years, with the median year of construction being 1926. For the eighteen schools 50 percent or more White, the median age of the buildings was 17 years, the median year of construction being 1952.[65] For instance, large portions of Benton Harbor Junior High, Boynton School and Columbus School were all constructed in the 1890's.[66]

The playground space provided children in the system's elementary schools also differed dramatically for identifiably White and identifiably Black schools. As of the second semester of the 1968–69 school year, the five schools 75–100 percent Black averaged 167.23 pupils per acre of playground space while the fourteen 75–100 percent White schools averaged 37.09 pupils per acre of playground space.[67]

At the beginning of the 1968–69 school year, the enrollment at the eight elementary and junior high schools 50–100 percent Black was 103.75 percent of capacity. At the nineteen elementary and junior high schools 50–100 percent White, the enrollment was 95.77 percent of capacity.[68] Using the defendant's estimate that the average capacity of a schoolroom is 25 students,[69] Benton Harbor Junior High was 136 students over capacity for the 1969–70 school year.[70] At the same time, Boynton and Britain schools were, respectively, 42 and 43 students over capacity. All three of these schools were more than 80 percent Black at the time.[71] For this same school year, the following schools were substantially under capacity: Fairplain East (34 students), Fairplain West (21 students),

Fairplain Northwest (44 students), Lafayette (28 students), Millburg (82 students), Pearl (17 students), Sorter (25 students), and Spinks Corners (19 students). All of these schools were more than 80 percent White.[72] Both Johnson (95 percent White) and Martindale (98 percent White) were over capacity, as was identifiably White Fairplain Junior High (97 students over capacity).[73]

Plaintiffs in their interrogatories to defendant asked the district to supply its *own* rating—excellent, good, fair, or poor—of the physical conditions, school facilities, and recreational space at the district's elementary schools and junior highs. When the ratings were compiled for 75–100 percent White and Black schools, the results were as follows: [74]

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Physical Conditions | | | | |
| White | 11 | 4 | 2 | 0 |
| Black | 0 | 6 | 3 | 0 |
| School Facilities | | | | |
| White | 11 | 3 | 2 | 1 |
| Black | 1 | 4 | 3 | 1 |
| Recreation Space | | | | |
| White | 12 | 3 | 1 | 1 |
| Black | 0 | 6 | 2 | 1 |

Although the district refused to concede that more than two schools were in "poor" condition, by their own estimations, the best facilities were those being attended by almost entirely White student bodies.

A management audit of the Benton Harbor public schools in August 1968 by Booz, Allen & Hamilton Management Consultants [75] made the following statement:

"An abnormally high level of maintenance expenditures will be required for

**65.** PX–15.

**66.** Schedule 73, Defendant's Answers to Plaintiffs' Interrogatories, filed November 14, 1968.

**67.** PX–34. The system average was 70.40 pupils per acre. Millburg School figures were not available and are not included.

**68.** PX–14. *Cf.,* Judge Kent's Finding of Fact No. 15.

**69.** See Schedule 73, supra, note 66.

**70.** PX–36.

**71.** *Id.*

**72.** *Id.*

**73.** *Id.*

**74.** PX–35, based upon Schedule 73, supra, note 66. Some schools have two ratings to distinguish between a new and old structure at the same site, or an annex.

**75.** Submitted in Answer to Plaintiffs' Interrogatories, filed November 14, 1968.

some period of time to bring the facilities of the Benton Harbor schools up to a reasonable standard." Id. at 67.

Although this statement was a generalization as to all schools in the district, it appeared to be aimed at several schools in particular, identified at page 112 of the report as having, among other problems, need for paint, evidence of leaking roofs, deteriorating eaves or cornices, apparent need for repair of exterior wall, or deterioration due to type and age of construction. The schools identified as being in this "poor" condition were Bard, Boynton, Hull, Lafayette, Chadwick, and Benton Harbor High School. All of these schools had substantial numbers of Black students, with the exception of Chadwick, which was a two-room school closed in 1969,[76] and Lafayette, the oldest White school in the district.[77] Additionally, Stump-Alma, the "black" school of the former Stump district, was identified as being in a "severely deteriorated" condition and as being in "much worse condition than Stump-Nickerson," the White school of the former Stump district, even though both schools were built at about the same time, 1955–58.[78] The superintendent of the defendant district at the time of trial conceded that the system's facilities which he considered inadequate, or in need of substantial improvement, were predominantly those where the enrollment was identifiably Black.[79]

Perhaps the two most glaring examples of unequal facilities are the conditions at Bard and Morton schools, the two schools in the district with the highest number of Black students at the time of consolidation. Conditions of an eight-room section at Bard School, built in 1928, had worsened to such an extent that the parents of Bard pupils refused to send their children to school there at the beginning of the 1969–70 school year. The boycott lasted about ten school days and was so effective that Bard did not open for the school year. The Board ultimately decided the conditions were so bad that the eight-room section had to be demolished and the children transferred elsewhere for the 1969–70 school year.[80]

In 1969, as a "temporary" solution to overcrowding at Henry Morton School the defendant purchased the former Grace Evangelical Lutheran Church facilities.[81] Five classrooms were established at this facility, four in the former schoolrooms, and one located in the former church sanctuary.[82] The church vacated the facilities when they chose not to make repairs ordered by the fire marshal.[83] Temporary permission to the district to move school children into this facility was given by the fire marshal, providing certain repairs were first completed.[84] The fire marshal's letter of approval indicates that use of a basement classroom in the facility was contemplated. Therefore, in order to relieve overcrowding at a 94 percent black school, the district *purchased* what was at best a dangerous, substandard learning facility, which the district itself recognized was not comparable to regular classroom space.[85] For the 1969–70 school year, the district assigned 87 students (83 of them Black) to the Morton Annex, despite available space at two contiguous schools—Hull (79 spaces available, 60.7 percent White) and Lafayette (28 spaces available, 94.1 percent White).[86] Ad-

---

76. Payne Testimony, Separate Transcript at 11.

77. Schedule 73, supra, note 66.

78. Booz report at 112. The Booz report, incidentally, recognized the racial imbalance in the district and recommended that the board "establish the district's policy regarding school integration of white and non-white students" as "no such policy" presently existed.

79. Testimony of Mark E. Lewis, Tr. 245.

80. Testimony of Lewis, Tr. 236–37; Testimony of Payne, Separate Tr. 52–53; Testimony of Raymond Sreboth, Separate Tr. 26–31. The students were then bused intact to other schools, which will be discussed in Part 5(A)(1)(E), *infra*.

81. Sreboth Testimony, Separate Tr. 23–25; Payne Testimony, Separate Tr. 60–62.

82. Schedule 73, supra, note 66; Payne Testimony, Separate Tr. 61.

83. Sreboth Testimony, Separate Tr. 25.

84. PX–63.

85. Payne Testimony, Separate Tr. 62.

86. PX–36.

ditionally, there was space available at two of the next closest schools—Johnson (29 spaces available, 95.3 percent White) and North Shore (6 spaces available, 92.4 percent White.) [87] The inequality of the Morton Annex facilities was best summed up by the parent of one Annex student:

"[T]o me, it is a very poor facility, and if it was in any other area, no one would allow their children to attend the Annex." [88]

There was much other testimony as to inequality of facilities and educational materials at identifiably Black and identifiably White schools. For instance, until the parents of children at Morton School formed a study committee on text books and then made formal protest to the school board, their children were taught with older, less up-to-date books than children in White schools.[89] Often, there were insufficient books to go around for all members of the class. One Morton parent, who had himself attended statutorily segregated schools in Louisiana, had the following colloquy with the Court:

"Court: Now, your basic complaint at the Morton Hill's School was that it related to the age of the material or as to the amount of material available?

Witness: Both.

Q. Both?

A. Both.

Q. Was the material older than you found at Fairplain East and Fairplain West?

A. Right.

Q. And there was a lack of sufficient number of text material?

A. This was right.

Q. And it didn't take—you said there was about half enough for the class?

A. Uh-hum.

Q. At Morton Hill School?

A. Right.

Q. Did you need a lot of education to figure that out?

A. No.

Q. And in regard to the new math and the old math, as between the two schools, I mean was it evident upon examination of the books that the new math that they were teaching at Fairplain was different than you had been taught?

A. Yes, it was different than what I had been taught.

Q. And the math that was being taught at the Morton School was the same as you had been taught?

A. Yes.

Q. You didn't have any difficulty in figuring that out?

A. No, that was simple." [90]

A similar committee at Stump-Alma School (100 percent Black when it was closed in 1968) found the same problem of old, outdated textbooks at Alma as compared to those used at the identifiably White Fairplain schools.[91] Some texts were ones that parents themselves had used when they were in grade school.[92]

One other area in which the identifiably White and identifiably Black schools differed, library facilities, requires examination because of the profound effect it may have on the education of plaintiffs and the class they represent. From the record made before Judge Kent it is apparent that five years after consolidation, the consolidation having as one of its purposes the equalization of educational facilities, library facilities in the identifiably Black elementary schools remained, for all practical purposes, non-existent.[93] Bard, Boynton, and Sterne

87. *Id.* The segregative intent apparent from this action will be discussed in Part 5(A)(2)(G), *infra.*

88. Testimony of Louis J. Joseph, Tr. 289.

89. *Id.* at 286–291.

90. *Id.* at 291–292.

91. Testimony of Katherine Turner, Tr. 303–307.

92. *Id.* at 304. For other incidents of disparate physical conditions between White and Black schools, see the testimony of Vergie M. Robinson regarding playground facilities (and lack thereof) at Boynton School, Tr. 345–348, and the testimony of Will N. Branscrumb regarding the poor physical condition of Benton Harbor Junior High as compared to Fairplain Junior High, Tr. 328–330.

93. Payne Testimony, Separate Tr. 114–118.

Brunson, specifically, and the inner city (i. e., identifiably Black) schools generally, had no formal libraries or librarians. The Fairplain schools, Sorter, Martindale, and Millburg all had formal library facilities (and all were identifiably White).[94] Although defendant argued that a lack of space at the overcrowded Black schools made it impossible to equalize library facilities, the Board had been able to manage the library at Millburg School in the hall of the building. At the very least BHASD could have equalized the number and types of library books at the district's elementary schools at minimal costs. The argument that there was a lack of room for formal library facilities would not have prevented this. Nor was there any attempt made to transfer children from the overcrowded Black schools to nearby under-capacity White schools in order to make room for formal library facilities.

■ By any standard of rating in the quality of school facilities (e. g., condition of buildings, playground space, educational materials, library facilities), the identifiably Black schools in defendant district were second-rate in comparison to identifiably White schools. The natural, probable and foreseeable consequence of the district's actions and intentional inaction in this regard was to deny students in identifiably Black schools equal educational facilities and opportunities and to maintain and increase the segregated condition of those schools. Although it is proper and reasonable to make this inference, the evidence goes beyond mere inference and necessitates a finding that these actions can be rationally attributed only to a deliberate and conscious intent to perpetuate segregated conditions in these schools. It was clearly and independently established that BHASD consciously decided to marshal its limited resources in the district's identifiably White schools, to the detriment of students in identifiably Black schools. The Board made

a conscious decision not to take action to equalize educational facilities at identifiably Black schools because such action would necessitate a decline in educational facilities in identifiably White schools. While under other circumstances it might be admirable for a school board to refuse to allow a decline in the quality of certain school facilities, it is not admirable where, as here, students in identifiably Black schools were forced to bear the major burden of sacrifice due to the Board's lack of adequate funds to administer the district.

### D. "Tracking" System.

Judge Kent's opinion that the "tracking" system for assigning students to learning groups at Benton Harbor Junior High differed from that used at the identifiably White Fairplain Junior High and denied Black students equal educational opportunity was affirmed by the Court of Appeals. The practice has apparently been discontinued and, therefore, will not be closely examined here. It need only be said that the practice was another indicium of de jure segregation which was considered by this court as part of the cumulative evidence of the constitutional violation which this court has found.[95]

### E. Intact Busing.

Intact busing, that is, the busing of Black children away from their home school to an identifiably White school and keeping the Black students intact in separate classrooms at the White school, is a "classic segregative technique." *Higgins v. Board of Education of Grand Rapids*, 508 F.2d 779, 787 (6th Cir. 1974). The record shows that when a portion of Bard School was demolished subsequent to a parent protest over its safeness, the students in those eight classrooms were transferred intact to other locations.[96] At that time, Bard School was 99.3 percent Black.[97] Four classrooms were bused to the former classroom site of Lake Michigan

---

**94.** *Id.*

**95.** Whether this "tracking" system was partly responsible for the higher drop-out rate for black students at Benton Harbor High is not clear. See PX–17, –17a, –18, and –18a.

**96.** Payne Testimony, Separate Tr. 52–53. Testimony of Ben J. Mammina (BHASD Director of Transportation), Tr. 257–259.

**97.** PX–36.

College (which the district owned), one classroom was bused to Seely McCord (95.5 percent Black), one classroom was bused to Stump Nickerson (31.9 percent Black) and two classrooms were bused to Millburg (0.0 percent Black). All students were kept intact at their new locations.[98] These students were bused intact to these new locations, two of which were at the opposite ends of the district (Millburg and Stump Nickerson) despite the fact that the adjoining school, Hull (60.7 percent White) had 79 vacant spaces. Additionally, the following next closest schools had space available: Johnson (95.3 percent White, 29 spaces), Lafayette (94.1 percent White, 28 spaces), Pearl (93.0 percent White, 17 spaces), and Sorter (93.2 percent White, 15 spaces).[99] With the single exception of the class sent to Seely McCord, all other classrooms were kept intact at a completely separate location or at identifiably white schools.

Intact busing can have severe educational and psychological impact upon Black and White students affected by it. As was stated by Dr. Robert Green, plaintiffs' expert witness: [100]

"Number one, transporting black children admittedly—as I stated earlier, black children in many instances at the fifth and sixth grade level in the City of Benton Harbor find themselves lagging behind their white counterparts in terms of educational achievement, reading was an example, I believe, given yesterday by one of the witnesses—removing these youngsters from the Bard Elementary School to a predominantly white elementary school, leaving them in intact classrooms, has educational implications in a very negative direction. Number one, the youngsters are perceived, it is known that they are lagging in achievement, and they are perceived by the administrator of the receiving school typically, by other teachers in that receiving school, as being educationally deficient. Not only individual youngsters are perceived as being ed-

ucationally deficient, it has other negative educational implications in the sense that the entire classroom is seen as being a deficient classroom. To me that is a much more negative, it has greater negative implications than perceiving an individual child as having an educational set of deficiencies.

\* \* \* \* \* \*

\* \* \* [I]t reinforces the same behaviors that might have occurred in the so-called all-black classroom that were negative in a sense, from a learning standpoint; that is, it reinforces that set of behaviors one would find by removing them and placing them in a predominantly white school.

Number two, self-conceptwise, it reinforces the impact of segregation. At least being in an all-black school, youngsters are able to perceive that there are other black youngsters in surrounding black classrooms. Keeping them intact and placing them in a predominantly white school intensifies their perception of themselves as being different, but also intensifies the perception of white children who perceive this as being not only an unusual classroom, but probably inferior. So there are not only negative educational implications, but also negative psychological implications.

\* \* \* \* \* \*

"And additionally, whenever blacks are deliberately separated or contained, I should say, by the white population, blacks and whites perceive that the separation is based upon a deficiency that is apparent in the black population—not in the white population, in the black population. This is a perception of both white and black children." [101]

■ One BHASD official mentioned in passing that the Bard classes which are at issue here were "still considered part of the

---

**98.** Payne Testimony, Separate Tr. 52–53.

**99.** PX–36.

**100.** Judge Kent stated he was "impressed by the conclusions and the opinions" of Dr. Green. Bench Opinion at 13.

**101.** Green Testimony, Tr. 569–572.

Middle Cities Program, which is a State of Michigan program for deprived areas." [102] Although no evidence was submitted as to what, if any, benefits accrued to the district by keeping the classes intact for purposes of the Middle Cities program, the fact that one class was kept intact at another Black school lends a surface validity to this assertion. A benign motivation, however, will not insulate a constitutional violation from censure. For instance, the defendant could not reasonably argue that it was permissible, in order to obtain more funds from the Middle Cities program, to concentrate the remaining lower income Black students in the district in another school in order to make it, too, eligible for the program. As was stated in *Arthur v. Nyquist*, 415 F.Supp. 904, 946 (W.D.N.Y.1976), discussing the benign motive asserted to justify assigning Black teachers to Black schools:

"It is not contended by this court that minority role models are not important for minority students. Racial and ethnic pride has its value. But, in the constitutional scheme, a higher value in the hierarchy of values is integration."

Although it is understandable for a district strapped of funds to attempt to retain certain government grants, where that action results in such a severe impact upon Black school children, it cannot be countenanced.

### F. Junior High Feeder Patterns.

The feeder patterns to BHASD's three junior high school facilities for the 1969–70 school year were as follows (percent Black at each school is shown in parentheses): [103]

(1) Benton Harbor Junior High.

Morton K–7 (97.3%)

Sterne Brunson K–7 (48.2%)

Columbus K–5 * (59.5%)

Calvin Britain K–6 (83.2%)

Seely McCord K–6 (95.0%)

Benton Harbor Junior High (81.7%)

* Sixth grade feeds into Britain and Brunson because of overcrowding.

(2) Hull Junior High.

Millburg K–7 ⟶ Johnson K–8
(0.0%) (4.7%)

Martindale K–8 (1.8%)

Boynton K–8 (84.6%)

Hull Junior High (39.3%)

Lafayette–North–Eaman Shore

K–3 K4–6 K7–8
(5.4%) (7.6%) (6.4%)

Bard K–8 (99.3%)

---

**102.** Payne Testimony, Separate Tr. 97. **103.** These figures are taken from PX–38.

(3) _Fairplain Junior High_.

Spinks——→Pearl K–6
Corners
K–3
(0.0%) (4.8%)

Sorter K–8

Stump (6.6%)
Nickerson
K–2
(31.9%)

Sodus 1–4

(26%)

Fairplain East K–6 —— Fairplain
Junior High
(16.1%)

(12.7%)

Stump
Nickerson K–2

(31.9%)

Fairplain Northeast K–7

(13.9%)

Stump
Nickerson——→ Fairplain West K–6
K–2
(31.9%) (17.7%)

Fairplain Northwest K–6
(3.9%)

The use of the above feeder patterns resulted in one junior high facility unidentifiable as to race, and two junior high facilities which were identifiable as to race.

The junior high feeder patterns existent for the 1969–70 school year were apparently the same feeder patterns used previous to consolidation.[104] The school board, despite awareness that this feeder pattern resulted in segregated conditions at two of the system's three junior high schools, made a conscious decision not to adjust the feeder pattern so as to increase integration at these two·schools.[105] As I have stated previously:

> In light of the clear notice and requirement of Brown I, where opportunities for positive action are presented, where the consequences of failure to act are clearly foreseeable, and where those consequences are significant contributions to the creation or maintenance of segregated schools, the failure to act is deliberate and intentional. Moreover, if the fabric of the law is to be preserved, if substance is to have meaning beyond form, if the promise of the Fourteenth Amendment is to be fulfilled, then the deliberate failure to act by either state or local authorities must itself be actionable in this court. Plainly, where public issues are framed and questions posed which bear directly on the quality of education, a deliberate negative response from school authorities or a deliberate omission to act, can affect the shape of subsequent circumstances just as materially as can affirmative decisions and action. State responsibility under the United States Constitution must logically be and is fixed in either context.

*Oliver v. Kalamazoo Board of Education,* supra, 368 F.Supp. at 178.

 The racial segregation at Benton Harbor and Fairplain junior high would have been one of the least difficult and least costly problems of segregation for BHASD to deal with. Sterne Brunson (600 students), a school 48.2 percent Black, was equidistant from both Benton Harbor and Fairplain junior highs.[106] An examination of maps submitted by the parties indicates that Pearl (158 students, 93.0 percent White) and Sorter (560 students, 93.2 percent White) were also equidistant from the two junior highs in question, both schools being easily accessible and located on major arterial roads (Napier and Pipestone roads).[107] By the simple expedient of transferring Brunson students to Fairplain and Sorter, and Pearl students to Benton Harbor Junior High, the racial balance at both schools could have been greatly improved. Further, merely by transferring students in the north end of the Fairplain Northwest attendance area (179 students, 96.1 percent White) to Benton Harbor Junior High and transferring those in the south end of the Seely McCord attendance area (678 students, 95.0 percent Black) to Fairplain Junior High, the board could have obtained a racial condition at both schools reasonably reflective of the racial condition in the district. These changes could have been accomplished with little or no injury to the district's claimed neighborhood school policy. In light of these facts, the Board's acts of omission create a presumption that its failure to act was itself a deliberate decision to forego its opportunity to correct the existing segregation in the junior highs and was itself an unconstitutional denial of equal protection of the law.

### G. Portable Classrooms and Temporary Facilities.

At the time of the original trial, defendant school board maintained thirteen portable classrooms at its elementary and junior high schools. Five portables were located at Bard, four at Benton Harbor Junior High, three at Calvin Britain, and one at

---

104. *But see* adjustments made to cope with overcrowding, *infra* Part V(A)(2)(H)(2).

105. Payne Testimony, Separate Tr. 118–124; Lewis Testimony, Tr. 183–184.

106. Payne Testimony, Separate Tr. 121.

107. PX–46; DXR–A, –B.

Sodus.[108] With the exception of the one portable in use at Sodus, all portables were placed at schools more than 80 percent Black. As previously noted, the White schools closest and next closest to the Bard School had available space.[109] Calvin Britain, although one of the more isolated areas in the district, was relatively close to the four Fairplain elementary schools, all of which were identifiably White and had space available (a total of 138 available spaces).[110]

Portable classrooms, of themselves not ideal educational facilities, serve to overload the central facilities of the schools—cafeterias, libraries, playgrounds, gyms, and so forth.[111] For instance, although Benton Harbor Junior High was listed as being 136 students over capacity for the 1969–70 school year, the use of the four portable classrooms, with their capacity of 83 students, meant that the central facilities of the school were in fact 219 students over capacity.[112] Portable classrooms also have a negative impact on the general community, who perceive the school as overcrowded and chaotic.[113]

Despite the board's awareness that the placement of these portable facilities at identifiably Black schools increased racial segregation in the district, the board contended that to transfer the overcrowded students to nearby White schools (either where space was available or by placing portables at White schools) would do violence to its claimed neighborhood school policy.[114] This was not consistent, however, with a previously promulgated Board policy regarding attendance areas: [115]

"On the elementary level your Board feels that the neighborhood school concept is fundamental and should be maintained. The elementary school child is better served educationally when attending a school as near to his home as possible. We do find, however, that in some cases existing buildings are not located in an area where sufficient space is available to handle the student body. In those cases where crowding is a serious problem, students may be moved to less crowded schools to improve their educational opportunities."

The school system's placement of these mobile units is further evidence of official action aggravating segregative conditions. Cf. *Keyes,* supra, 413 U.S. at 202, 93 S.Ct. at 2686, 37 L.Ed.2d at 559. The use of portables at Calvin Britain and Bard schools, given the available space at nearby White schools, suggests an intent to contain Blacks at these schools. Cf. *Reed v. Rhodes,* supra, 422 F.Supp. at 769. Placing portable units at Benton Harbor Junior High, thereby drastically overcrowding its central facilities, rather than transferring students to either Hull or Fairplain Junior Highs, or erecting portables at Fairplain (and transferring some Benton Harbor Junior High students there), indicates an intent to contain Black students at Benton Harbor Junior High. That alteration of boundaries or transportation of students to relieve overcrowding was a viable alternative is demonstrated by the above expressed Board policy and its many instances of changes in attendance zones and transportation of students in the White suburban and rural areas.[116]

A similar inference arises from the opening of "temporary" facilities at Morton Annex. As noted previously, this nearly all-Black facility was opened despite available

---

108. J. Kent, Findings of Fact No. 14.

109. *See* Part V(A)(2)(E), supra.

110. *See* map, PX–47, and building utilization figures in PX–36.

111. Green Testimony, Tr. 596–597.

112. PX–36.

113. Green Testimony, Tr. 597.

114. Lewis Testimony, Tr. 186–187.

115. DX–F. Minutes of the Regular Meeting of the Board of Education, December 12, 1966 at 4.

116. *See* Part V(A)(2)(H)(2), infra.

space at nearby White schools.[117] That action also suggests an intent to contain Black students in the Morton attendance area.

### H. Neighborhood School Policy.

The primary defense of BHASD throughout these proceedings has been that the operative principle behind the actions challenged here has been its "neighborhood school policy." "Policy" is taken here to mean not merely what is actually done, but rather a set of general goals which were adopted for governmentally legitimate reasons, which bear a rational relation to the functions to be served, and which are routinely and consistently followed, unless a sufficiently compelling reason appears for departures in individual cases. In the first instance, this court must determine whether or not the defendant has consistently and resolutely followed a "neighborhood school policy." In this regard, the court will examine both the transfer policy in the district and boundary changes through 1970.

### (1) Transfer Policy.

At the time of trial, the defendant school board followed a rather broad voluntary transfer policy. Parents were permitted to transfer their children from one school to another school, without giving any reason, so long as there was space available at the receiving school.[118] Although it was generally required that the sending school be overcrowded, transfers were often granted even if the sending school was not overcrowded.[119] There was, however, one rather arbitrary condition to this transfer policy—that a request to transfer to a school with space available would not be granted if there was a fear that granting the initial request would lead to a "mass" of further

requests to transfer by other parents. As was stated by Robert Payne, defendant's Assistant Superintendent for Personnel, who granted permission for such transfers: [120]

"In making a transfer, there is also the question, if you do for one, you do for others within the same area. I would not permit a transfer to take place if it resulted in a mass group of people wanting to go and would overcrowd the facilities. . . . I always make this statement on any transfer, that the transfer is possible as long as it does not create a problem within that area that would cause an influx of a large number of students being transferred to overcrowded schools. . . . "

At one point, in fact, the defendant sent letters to parents of children at Bard, Seely McCord, and Morton schools (all identifiably Black), asking them to voluntarily send their children to the less crowded Fairplain East and Fairplain West schools (both identifiably White).[121] In another instance, a transfer request from Hull (39.3 percent Black) to Martindale (0.0 percent Black), which had been approved during the 1969–70 school year by the Martindale principal and an attendance officer, was rescinded by Assistant Superintendent Payne only when several other Hull families made a similar request.[122] For this school year, Martindale School was 22 students over capacity and Hull School was 79 students under capacity.[123] The first grade room to which one child had at first been permitted to transfer at Martindale had 37 students and the first grade room transferred from at Hull was about 25 students.[124] Therefore, it appears transfers were allowed even from an under-capacity school to an over-capacity school, so long as a number of other families did not try to take advantage of the transfer.

117. See Part V(A)(2)(C), supra.

118. Payne Testimony, Separate Tr. 62–80.

119. Id. at 70.

120. Id. at 64–65.

121. Id. at 56. See, Memo from Asst. Superintendent Payne to Superintendent Johnson of October 6, 1966, Answer to Plaintiffs' Interrogatory 59(b).

122. Id. at 70–76.

123. PX–36.

124. Payne Testimony, Separate Tr. 72–73.

As to transfers from identifiably Black Benton Harbor Junior High to identifiably White Fairplain Junior High, the Board, in the five years previous to trial, "routinely" denied all parental requests for transfers.[125] There appear to have been many such requests. However, Assistant Superintendent Payne could not recall a single request during that same time period to transfer a student the other direction—from White Fairplain to Black Benton Harbor Junior High.[126]

The Board offered no evidence that these transfers were permitted only if they did not increase the segregated conditions at the sending and receiving schools. Although there was no direct evidence that this policy was primarily used by White students to transfer from increasingly Black schools to identifiably White schools, this court believes that that situation was likely to and actually did result from such a policy.[127] A policy which allows transfers from racial minority schools to racial majority schools, even when restricted, is tantamount to an authorization for White students to flee and is a means for the perpetuation of segregation. *Davis v. Board of School Commissioners*, 414 F.2d 609 (5th Cir. 1969); *Monroe v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Goss v. Board of Education*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). What is presently at issue, however, is not whether the transfer policy was racially motivated, but whether the district's claimed neighborhood school policy was consistently applied. The voluntary transfer policy indicates that it was not.

(2) *Boundary Changes.*

One of the problems throughout this litigation is that the defendant maintains no map or formal records of the boundaries of each elementary school's attendance area.[128] Consequently, testimony from those most knowledgeable about boundary changes was confusing and often contradictory. I will try, however, to summarize these patterns as clearly as is now possible.

One major area of boundary changes followed the closing of the Stump Alma, Chadwick, and Mount Pleasant elementary schools. Mount Pleasant School, which was located within the present Sodus attendance area at the extreme southeastern tip of the district, was closed after the end of the 1966–67 school year. Mount Pleasant, identifiably White, was a K–8 elementary school. Grades K–6 were transferred to Sodus School and grades 7 and 8 were transferred to Fairplain Junior High. Both these schools were identifiably White.[129]

On November 11, 1968, in a budget-cutting move, the Board closed Chadwick and Stump Alma schools. Chadwick, a K–8 school and identifiably White, lay at the north end of the present Sodus School attendance zone (again in the extreme southeastern portion of the district). Former Chadwick Kindergarteners were sent to Stump Nickerson School. Grades 1 through 4 were transferred to Sodus School. Grades 5 and 6 were transferred to Fairplain East School and grades 7 and 8 to Fairplain Junior High. All of these schools were identifiably White.[130] Stump Alma, identifiably Black, contained grades 2 through 5 at the time it was closed. Alma lay in the south central portion of the district. Its 73 students were dispersed to Fairplain East, Fairplain West, and Sorter schools, all identifiably White.[131] Although the defendant

125. *Id.* at 77–78.

126. *Id.* at 78.

127. The transfer policy was also taken advantage of by Black parents to transfer their children from substandard Black schools to better quality White schools. Joseph Testimony, Tr. 287; Branscrumb Testimony, Tr. 328–329.

128. Troffer Testimony, R–Tr. 137–139.

129. Payne Testimony, Sep. Tr. 9–10.

130. *Id.* at 11–12.

131. *Id.* at 13–15. The present Superintendent admits this was consistent with the "neighborhood school" concept only by a 'loose definition.' " Helser Testimony, R–Tr. 315–316.

contends that it has consistently maintained the boundary lines of the predecessor districts, none of the students transferred from Alma were sent to the other school of the former Stump district—Stump Nickerson. After closing, all Stump Alma students attended school outside the former Stump district.

Another major area of boundary changes occurred in the three schools on the northwestern edge of the district fronting Lake Michigan—Lafayette, North Shore, and Eaman. The attendance areas of these three schools, all formerly independent districts, were merged. These three schools were formerly K–8 schools and were all identifiably White. Kindergarten through grade 3 students from these three attendance zones were transported to Lafayette; grades 4 through 6 to North Shore; and grades 7 and 8 to Eaman.[132] Again, the boundary lines of the independent predecessor districts were ignored by the board.

There were several other changes made in the grade patterns of outlying, identifiably White schools which had the effect of changing or eliminating the attendance boundaries of the previously independent districts. Stump Nickerson became a K–2 school with its upper grades transferred to Fairplain East, Fairplain West, and Sorter schools. Spinks Corners became a K–3 school, sending its grades 4 through 6 to Pearl, and its grades 7 and 8 to Sorter.[133] (Boynton School, 84.6% Black, was equidistant from the Pearl-Spinks Corners area and was 60 students under capacity for the 1969–70 school year).[134]

At one point in his testimony, Assistant Superintendent Payne gave a litany of boundary changes and transfers, which reads in part as follows: [135]

"We moved from the Pearl seventh and eighth grades to Sorter; we moved from Calvin Britain third grade entirely, three rooms, two rooms to Sterne Brunson and one to Sorter; we moved the Bard ninth grade to the high school; we moved Bard elementary schools north of Territorial and Main Street to the Morton School so that they would not have to cross Territorial and Main Street; we moved Sodus seventh and eighth grades to Fair Plain Junior High; made voluntary transfers from Bard, Seely McCord and Morton to relieve overcrowding, to the Fair Plain East and Fair Plain West.

\* \* \* \* \* \*

In 1967–'68, we moved all kindergarteners from Sodus, Chadwick, Alma and Stump to Stump Nickerson. We moved the Alma's sixth grade from Stump Nickerson back to Alma. We closed the Mt. Pleasant School, sent those students to Sodus and Fair Plain Junior High, seventh and eighth graders.

We held the seventh grade back at the Sterne Brunson School, which is in the city, and at the Morton School, which is in the city to relieve an overcrowded condition at Benton Harbor Junior High.

This (indicating) is two rooms at Sterne Brunson and three rooms at Morton, approximately 60 students at Sterne Brunson and 75 students at Morton.

We moved the Spinks Corners fourth grade to Pearl.

We moved the children south of the I–94 interceptor, which is Main Street coming in, the children south of I–94 were moved from Hull to Boynton on the recommendation of the State Highway Department so that the smaller children did not have to cross the I–94 interceptor, because of the double highway.

We continued to transfer from Bard, Morton and Seely to Fair Plain East and Fair Plain West to relieve overcrowding and this was approximately a hundred students.

We moved the ninth grade out of the high school, all ninth graders, to Hull School.

---

**132.** PX–38.

**133.** *Id.*

**134.** PX–47; PX–36.

**135.** Payne Testimony, Sep. Tr. 55–59.

And we moved the third grade at Sorter and Sterne Brunson back to Calvin Britain. This was due to the last move there, the third grade back—there was space—well, we added the portable rooms at Calvin Britain upon parental request to have their children back closer to their home.

In 1967 and '68, we purchased five portable classrooms. One went to Bard, three to Britain and one to Sodus. We also purchased a church which had five rooms in it. That is now called the Morton Annex.

"In 1968–'69 we moved Millburg's eighth grade to Johnson. We moved Sodus five and six to Chadwick, this was in September. We moved Chadwick's one, two, three and four to Sodus. We moved the seventh grade from Stump Nickerson to Fair Plain Junior High. We moved Alma sixth grade to Stump Nickerson. We moved 25 kindergarteners from Boynton to Fair Plain Northwest. We moved 25 kindergarteners from Columbus to Fair Plain Northeast. And we moved the adjusted study room from Fair Plain Northeast to Millburg.

In November of that year we closed the Chadwick and the Alma School. The fifth and sixth grades from Chadwick were sent to Fair Plain East, and the Alma two, three, four and five to Fair Plain East, West and Sorter.

In 1969 we moved the Stump Nickerson sixth grade to Fair Plain West and Northwest. We moved the Columbus sixth grade to Calvin Britain. We moved the adjusted study room from Millburg to Sorter. We moved special education rooms through the years to buildings where there is space available."

With the exception of transfers of Kindergarten pupils (who then returned to their "regular" school for first grade) and voluntary transfers (the race of the transferee not being ascertainable from the record—but the inference being that the majority were White students transferring out of identifiably Black schools to identifiably White schools), nearly all of the transfers named, presumably to relieve overcrowding, were from identifiably White to identifiably White schools or from identifiably Black to identifiably Black schools.[136] In fact, Assistant Superintendent Payne admitted that when changes in the grade patterns or feeder patterns of schools are considered (e. g., the Eaman, North Shore, Lafayette zone merging), all changes occurred in the outlying identifiably White areas, with no changes being made in the identifiably Black, inner-city areas.[137]

### (3) *Was There a "Neighborhood School Policy?"*

Both the then-Superintendent of Schools, Lewis, and plaintiffs' expert witness, Dr. Robert L. Green, agreed upon what is generally meant by the term "neighborhood school." Superintendent Lewis described it as the contiguous area within walking distance of a school (depending on a child's age), having as its boundaries highways, rivers, etc.[138] Dr. Green described it as a geographical unit determined by the distance a child must travel to a given school and boundaries such as freeways, railroads, etc.[139] Superintendent Lewis made a rather revealing response to a question by plaintiffs' attorney as to whether the neighborhood school concept reflected the idea of a neighborhood of homogeneous population. He conceded that, "if you look at all of the neighborhood schools, you would have to conclude that, yes, there is some type of commonality among the people in that area."[140]

As I stated at the outset of this section, the "policy" of neighborhood schools claimed to be followed here is taken to mean not merely what is actually done, but

136. See PX–36.

137. Payne Testimony, Sep. Tr. 120–121. The exception being the changes made when the 73 students at racially-isolated Stump Alma School were transferred upon its closing.

138. Lewis Testimony, Tr. 187–188.

139. Green Testimony, Tr. 545.

140. Lewis Testimony, Tr. 188.

rather a set of general goals which were adopted for governmentally legitimate reasons, which bear a rational relation to the functions to be served, and which are routinely and consistently followed, unless a sufficiently compelling reason appears for departures in individual cases. From the record made before Judge Kent, the conclusion is inescapable that defendant's "neighborhood school policy" existed only on paper, to be applied only where the identifiably Black, inner-city schools were concerned. Only as to Black schools was this policy consistently and resolutely followed. For instance, the following exchange took place between plaintiffs' attorney and Superintendent Lewis: [141]

"Q. If you had located these portables at predominantly white schools instead of at the predominantly black schools and assigned the pupils that were overcrowded in the predominantly black schools to these portables, to these school locations, would this not have tended to decrease the racial isolation in the black schools?

"A. If that could have been done, yes. That would not have been consistent with our policy, however, and the policy I mentioned is the neighborhood school concept."

Yet students as young as Kindergarten level were transported out of their "home" attendance zones for school in the Lafayette-North Shore-Eaman cluster. Yet Kindergarteners from the Sodus area were sent to Stump Nickerson for class, a distance further than the distance between any of the identifiably Black inner-city schools and any of the identifiably White Fairplain schools.[142] Yet children leaving the second grade at Stump Nickerson school were sent to any one of three different schools (Fairplain East, Fairplain West, and Sorter) outside their "home" attendance area. The exceptions to this "policy" go on and on. On the basis of even this cursory view of a very small amount of the evidence presented in this case, this court cannot conclude that the Benton Harbor Area

School District resolutely and consistently maintained a "neighborhood school policy." The alleged "policy" has been too often departed from to have been a firm and consistent goal of the Benton Harbor Board.

■ Adoption of the then existing, segregated school attendance zones by the Board at the time of consolidation in 1965 does not, of itself, justify a finding of *de jure* segregation. *Berry* supra, 505 F.2d at 243. I find, however, that defendant's decision not to adopt new attendance boundaries in the face of a readily discernible pattern of residential segregation is part of the cumulative evidence of the constitutional violation found here. It was a decision to forego an opportunity for integration at a time when the Board was examining attendance lines, grade patterns, and the "equalization" of programs in the newly consolidated district.

The evidence submitted on the issue of the "neighborhood schools" policy leads this court to several conclusions. First, that defendant, in fact, had no neighborhood school policy. As was said in a recent Sixth Circuit opinion:

"While purporting in theory to follow a racially neutral 'neighborhood schools' policy, the Board in practice has adhered to a policy of 'neighborhood schools' where it justified racial segregation of students and deviated from the policy when necessary to prevent meaningful integration of the elementary schools." *NAACP v. Lansing Board of Education*, 559 F.2d 1042, 1056 (6th Cir. 1977).

The defendant's claimed motivation that its actions were part of a "neighborhood schools" policy must be rejected.

■ Second, the evidence shows that student transfers, boundary changes, and grade pattern changes had the effect of continuing and increasing the segregated conditions in defendant's schools, thereby creating a prima facie case of de jure segregation. As was said in *Lansing Board*, supra, at 1050:

---

**141.** *Id.* at 186–187.

**142.** PX–47.

"Attendance zone alterations which have the effect of exacerbating racial imbalance and isolation are probative of segregative intent. *Keyes v. School District No. 1*, 413 U.S. at 201 [, 93 S.Ct. 2686;] *Oliver v. Michigan State Board of Education*, 508 F.2d at 184; *Bradley v. Milliken*, 484 F.2d 215, 221–36 (6th Cir. 1973), *rev'd. on other grounds*, 418 U.S. 717 [94 S.Ct. 3112, 41 L.Ed.2d 1069] (1974); *Davis v. School District*, 443 F.2d 573, 576 (6th Cir. 1971); *United States v. Board of School Commissioners*, 474 F.2d 81, 85–86 (7th Cir. 1973)."

The use of such transfer policies, boundary changes, and grade pattern changes had as their natural, probable, foreseeable and actual consequence the continued segregation of defendant's schools.

### B. Record of the Trial on Remand.

█ The question for this court on remand was whether defendants could successfully negate the prima facie case of de jure segregation that had been made against them. This required that I examine those indicia of segregation noted by the Court of Appeals and the evidence BHASD submitted in its defense to determine if defendants have affirmatively established that their action or inaction was a consistent and resolute application of racially neutral policies. In those instances where Board practices have already been determined to be racially discriminatory (assignment of teachers upon a racial basis and the Benton Harbor Junior High "tracking" system), or where I have determined that Board practices create not just a presumption of de jure segregation, but could only be rationally attributed to purposeful and intentional discrimination, I must examine the evidence offered in rebuttal to determine if the effects of these discrimina-tory practices have been remedied by subsequent Board actions.

In support of its defense, the Board called just two witnesses, the present BHASD Superintendent and the present BHASD Group Director of Operations and Facilities. The Board offered only twelve exhibits. Plaintiffs responded with numerous exhibits and six witnesses, among them a former BHASD Superintendent and a former BHASD Board member. The trial on remand lasted four days and produced over 700 pages of testimony. The following Findings of Fact are based upon those exhibits and that record.

### (1) *Racial Segregation.*

When this case was first filed, the Benton Harbor Area School District was 44.3 percent Black.[143] At the time of trial before Judge Kent, BHASD was 48.8 percent Black.[144] Today, some seven years later, the district is 73.1 percent Black.[145] The increased percentage of Black students is largely reflective of the out-migration of Whites from the City of Benton Harbor and certain areas of Benton Township and the in-migration of younger Black families from the Chicago area and from several southern states.[146] The population of the City of Benton Harbor has decreased from a high of 19,136 in 1960 (of whom 14,290 or 74 percent were White) to a present estimated population of 15,421 (of whom only 3,085 or 20 percent are White).[147]

According to the "fourth Friday" count for the 1976–77 school year, only two of the district's 26 elementary and junior high schools were racially unidentifiable: Fairplain Northeast and Fairplain Junior High.[148] All eight schools that were more than 40 percent Black in the 1969–70 school

---

143. PXR–12.

144. *Id.*

145. PXR–6.

146. DXR–I: "Population and Mobility Trends in Benton Harbor and Related Areas," prepared by the Economic and Marketing Research De-partment of the Whirlpool Corporation, which has a major facility in the Benton Harbor area.

147. DXR–C and –C1.

148. DXR–D and PXR–12. Fairplain Northeast is 61.8% Black and Fairplain Junior High is 63.4% Black.

year are now more than 90 percent Black.[149] One elementary facility opened since the 1970 trial also has a Black enrollment in excess of 90 percent.[150] Nine elementary schools remain less than 25 percent Black.[151] Six other schools remain identifiably White, as that term is defined here.[152] One White school, Eaman, has been transferred by the State Board of Education to a neighboring school district since the time of the original trial.[153] For the 1976–77 school year, 63.9 percent (1,084 of 1,697) of White elementary students attended schools 0–25 percent Black. For this same period 83.02 percent (3,781 of 4,554) of Black elementary students attended schools 90–100 percent Black. Additionally, two special programs, Alternative Education and School Age Mothers, are respectively 97.7 and 95.7 percent Black.[154] Benton Harbor High School is presently 75.5 percent Black.[155]

The attitude of defendants toward the racial segregation in the Benton Harbor schools is succinctly summarized by a statement made in a November 9, 1970 memo to the Board from the then-Superintendent. In that memo, conveying the October 2, 1970 racial census, Superintendent Lewis, under the heading "Reason for Board Consideration" states "Information. No Board action necessary."[156]

Defendant BHASD continues to maintain that the racial segregation existing in defendant's schools is solely the result of a racially-neutral neighborhood school policy, combined with residential segregation over which they have no control. As has been discussed above, and will be discussed more fully below, there was, in fact, no "neighborhood school" policy which was consistently and resolutely applied in a racially neutral manner. Defendants have introduced no evidence which would indicate otherwise. With regard to the racial segregation in defendant's schools, plaintiffs have shown action and inaction by public officials, with a segregative purpose, which actually resulted in increased and continued segregation of the Benton Harbor public schools. *NAACP v. Lansing Board of Education*, No. 76–1267, 559 F.2d 1042 (6th Cir. 1977); *Oliver v. Michigan State Board of Education*, 508 F.2d 178 (6th Cir. 1974).

The defendant school board cannot disclaim all responsibility for the interaction between residential and educational segregation in Benton Harbor. As was said by Judge Duncan, of the Southern Division of Ohio, commenting on the Columbus school case:

> The Court finds that in Columbus, like many other urban areas, there is often a substantial reciprocal effect between the color of the school and the color of the neighborhood it serves. The racial com-

**149.** Percent Black students (based upon PXR–12):

| | 1969–70 | 1976–77 |
|---|---|---|
| Bard | 99.3 | 99.6 |
| Boynton | 78.9 | 92.2 |
| Britain | 54.3 | 98.5 |
| Columbus | 59.5 | 99.5 |
| Morton | 97.1 | 99.6 |
| Seely McCord | 94.5 | 97.5 |
| Sterne Brunson | 48.2 | 94.7 |
| Benton Harbor Jr. | 81.7 | 98.1 |

**150.** Martin Luther King, Jr., School, opened in the former Lake Michigan College building, presently has a Black enrollment of 97.7%. PXR–12. See Part V(B)(7), *infra*.

**151.** Percent Black students (Id.):

| | 1969–70 | 1976–77 |
|---|---|---|
| Fairplain Northwest | 3.9 | 17.8 |
| Fairplain West | 17.7 | 22.8 |
| Johnson | 4.7 | 21.7 |
| Martindale | 1.8 | 17.9 |
| Millburg | 0.0 | 0.0 |
| Pearl | 4.4 | 13.6 |
| Sodus | 26.0 | 0.0 |
| Sorter | 6.6 | 7.1 |
| Spinks Corner | 0.0 | 0.0 |

**152.** These schools had the following percentages of Black students in a district that is now 73.1% Black: Fairplain East (34.8), Hull Elementary (55.0), Lafayette (54.3), North Shore (56.3), Stump Nickerson (50.0), and Hull ⅞ (43.9).

**153.** *See*, Part V(B)(9).

**154.** PXR–6 at 15.

**155.** *Id.*

**156.** PXR–25–1.

position of a neighborhood tends to influence the racial identity of a school as white or black. This identification comes in the form of student, teacher, and administrative assignments as well as the location and attendance boundaries of the school. When the number of black pupils increases, the number of black teachers increases, and a black principal is assigned; the school then becomes less attractive for white students to attend. The racial identification of the school in turn tends to maintain the neighborhood's racial identity, or even promote it by hastening the movement in a racial transition area. White families tend to cease migrating into such a neighborhood, and tend to move out of the area.

The Court has received considerable evidence that the nature of the schools is an important consideration in real estate transactions, and the Court finds that the defendants were aware of this fact. The defendants argue, and the Court finds that the school authorities do not *control* the housing segregation in Columbus, but the Court also finds that the actions of the school authorities have had a significant impact upon the housing patterns. The interaction of housing and the schools operates to promote segregation in each. It is not now possible to isolate these factors and draw a picture of what Columbus schools or housing would have looked like today without the other's influence. I do not believe that such an attempt is required.

I do not suggest that any reasonable action by the school authorities could have fully cured the evils of residential segregation. The Court could not and would not impose such a duty upon the defendants. I do believe, however, that the Columbus defendants could and should have acted to break the segregative snowball created by their interaction with housing. That is, they could and should have acted with an integrative rather than a segregative influence upon housing; they could and should have been cautious concerning the segregation influences that are exerted upon the schools by housing. They certainly should not have aggravated racial imbalance in the schools by their official actions.

*Penick v. Columbus Board of Education,* 429 F.Supp. 229, 259 (S.D.Ohio 1977).

In the instant case the school board practiced de jure segregation in a meaningful portion of the school system by techniques that indicate that the "neighborhood school" concept was not maintained free of manipulation. Their mere assertion of that policy is, therefore, not dispositive. *Keyes,* supra, 413 U.S. at 212, 93 S.Ct. 2686. Where Board action and inaction hastened the segregation of Benton Harbor schools, which in turn hastened the residential segregation of the adjoining neighborhoods, the Board had a duty to correct the segregative educational conditions over which it had control.

(2) *Teacher and Staff Assignment.*

The teacher assignment policy of the defendant district is not at issue here. As has been discussed above, the teacher assignment policy used by the Board was found to discriminate on the basis of race, a finding affirmed by the Court of Appeals. That practice is part of the cumulative evidence of the constitutional violation found here. The scope of the remedy ordered, however, must be commensurate with the scope of the constitutional violation. Therefore, this court must examine what impact the teacher assignment policy had on the current racial distribution of the Benton Harbor school system. It must also be determined if subsequent Board policies have remedied any of the effects of the violation.

The evidence before Judge Kent convinced him that the defendant district unconstitutionally assigned teachers upon the basis of race. The assignment of faculty and staff, on racially identifiable bases, has been recognized as "earmarking schools according to their racial composition," thereby causing further racial concentration in the schools. *Keyes,* supra, 413 U.S. at 202, 93 S.Ct. 2686. This experience is reflected in the facts of this case.

At the time of trial in 1970, Black teachers in Benton Harbor comprised 17.7 percent of the total number of Benton Harbor teachers. At Bard (55 percent), Boynton (18 percent), Calvin Britain (26 percent), Hull (26 percent), Morton (58 percent), Seely McCord (39 percent), and Benton Harbor Junior High (40 percent), the percentage of Black teachers exceeded the system average.[157] With the exception of Hull Elementary School (today 55.0 percent Black), all of these schools today are essentially one race, Black schools.[158] Of the two other schools which are now entirely Black schools, Columbus had the next highest percentage of Black teachers in the district for the 1969–70 school year (13 percent) and Sterne Brunson had no Black teachers.

Although the defendant has made substantial progress in increasing the number of Black teachers in the district (presently comprising some 30 percent of the district's 516 teachers), there remains a pattern of assigning a greater number of White teachers to White schools and Black teachers to Black schools. Eighty of the district's 154 Black teachers (or 52 percent) today teach at 90–100 percent Black schools, even though only 39.15 percent of the district's teachers teach in those schools.[159] Although the system's teachers are 30 percent Black, teachers at 90–100 percent Black schools are 39.60 percent Black.

A similar situation exists at the system's nine 0–25 percent Black schools. Only eleven (7.1 percent) of the district's Black teachers teach at such schools, although teachers in those schools comprise 11.82 percent of the system's teachers.[160] Only eleven of sixty-one teachers at 75–100 percent White schools are Black (18.03 percent), making the percentage of Black teachers at White schools approximately one-half the system average.

Although Judge Kent ruled during the 1969–70 school year that teaching assignment was unconstitutionally being done on the basis of race, the defendant assigned only one or no black teachers to fourteen of the district's elementary schools as late as the 1974–75 school year.[161] All of these schools were identifiably White.[162]

The defendant district adopted an affirmative hiring policy in February of 1975.[163] Until that time, the principal of a school was allowed to dictate the race of teachers assigned to that school. For instance, if the principal of an identifiably Black school did not wish White teachers assigned to that school, they would not be assigned.[164] Conversely, if a principal of an identifiably White school did not wish Black teachers on his or her staff, they would not be assigned. This was so even though the Superintendent of Schools, under the collective bargaining agreement, had sole authority to assign faculty and staff.[165] This power was not used to comply with this court's order or to achieve racial desegregation of the teaching staffs until the 1975–76 school year.

In the first school year following consolidation, none of the eighteen school principals in the district was Black, and only one of the four assistant principals (or administrative assistants) was Black.[166] The number of Black principals has increased until today seven of seventeen school principals, or 41.2 percent, are Black. Of these seven Black principals, however, six are assigned to elementary schools 90–100 percent Black and the seventh is principal of 75.5 percent Black Benton Harbor High School.[167] The

157. PX–20; DXR–E1.

158. PXR–6; DXR–D.

159. PXR–49–A; PXR–E1.

160. *Id.*

161. DXR–E2.

162. PXR–4 at 21.

163. Testimony of Richard Helser, Superintendent of Schools, R–Tr. 204.

164. *Id.* at 297.

165. *Id.* at 218.

166. DXR–F; PXR–44. There are fewer principals than there are schools, as a principal may be in charge of more than one school.

167. PXR–45.

only time the district had a black principal at a school that was not identifiably Black was during the 1973–74 school year for the Stump Nickerson-Sodus unit (which were then, respectively, 44.5 and 23.4 percent Black).[168] For the 1976–77 school year, two schools having White principals had Black assistant principals, but, with the exception of the high school (which has two assistant principals and two administrative assistants) no school having a Black principal had a White assistant principal or administrative assistant.[169] Although the Superintendent has authority to transfer principals, this authority has not been exercised, except in one instance where the White principal of Columbus was transferred to the Spinks Corner-Johnson-Millburg unit, being replaced by another White principal.[170]

Although BHASD has been under an injunction of this court for seven years to "desist from assignment of teachers on the basis of race," most schools in the district continue to be racially identifiable upon the basis of the teachers assigned there. When principals are also considered, the racial identifiability of the Benton Harbor schools is even starker. These teacher and administrator assignment policies permeated the entire system and worked to deny equal opportunity to all students in the defendant district. The defendant has introduced no evidence showing the constitutional violation caused by these practices has been remedied. By its faculty and staff assignment policies, the Board earmarked the inner city schools as "Black" schools, thereby hastening the flight of White students from those schools. These same assignment policies earmarked other schools in the district as "White" schools and resulted in their continued segregation.

· (3) *Physical Conditions.*

The evidence introduced at the 1970 trial showed drastic differences between age of

construction, playground facilities, overcrowding, structural conditions, textbooks, and library facilities at identifiably White and identifiably Black elementary and junior-highs. I concluded that these differences created not just a presumption of segregative intent but rather could be rationally attributed only to a conscious intent on the part of the Board to marshal its limited resources in the district's White schools, at the expense of students attending the district's Black schools. The defendants offered no evidence at the trial on remand indicating otherwise. (Were the evidence introduced before Judge Kent on the differences in physical conditions between Black and White schools to create only a prima facie case of de jure segregation, then that presumption was not rebutted at the trial on remand.)

Since the original trial, the board has been unable to pass any bond proposals for capital improvements.[171] With the exception of some work at the high school, no major structural improvements have been made in the district. Consequently, school facilities deemed obsolete by outside consultants (e.g., Benton Harbor Junior High) remain in use. In 1970, the median age of original construction of school facilities remaining in use for the seven schools 50 percent or more Black was 43 years, the median year of construction being 1926. For the eighteen schools 50 percent or more White, the median age of the building was 17 years and the median year of construction 1952.[172] As of this year, the median age of the nine schools 90–100 percent Black is 58 years, with the median year of construction being 1919. For the nine schools 0–25 percent Black, the median age of the facility is 27 years, with the median year of construction being 1950.[173]

Since the original trial there have been two major changes in facilities. In 1971,

168. PXR–44; Helser Testimony, R–Tr. 227.

169. *Id.*

170. Helser Testimony, R–Tr. 228; PXR–44 at 10–11.

171. *See* Part V(B)(9), *infra*

172. *See* Part V(A)(2)(C), *supra.*

173. PXR–16, –17, –40.

the Morton Annex [174] was closed after four years of use. That action eliminated this substandard facility from the district. At the same time, the Board opened the Martin Luther King, Jr. School in the former classroom building of Lake Michigan College and assigned fourth through sixth graders from two Black schools there. [175]

Problems with overcrowding are not as serious today as they were for the 1969–70 school year. The parties introduced no evidence at the trial on remand going directly to the issue of building capacity and overcrowding. However, by comparing school capacity given in 1970 [176] with exhibits showing any changes in classroom facilities since that time (e. g., location of portable classrooms, closing of portions of schools) [177] and present enrollment, [178] it is possible to tell which structures are today at or over capacity. Due largely to the drop in overall enrollment (from 11,755 in 1969–70 to 10,-368 for 1976–77), only one school, Fairplain Junior High, is over capacity. Three schools: Columbus, Fairplain Northwest, and Sterne Brunson, are at capacity. Although the buildings themselves are not overcrowded, there is a noticeable difference between Black schools and White schools as to the average number of students per teacher, with teachers in Black schools having significantly larger class loads than those in White schools. [179]

At the trial on remand, the Board offered no evidence that it had made any attempts to equalize recreational facilities, library facilities, or the structural conditions of the various school buildings. It must be concluded, therefore, that the inequality in educational facilities between Black and White schools was the result of purposeful discrimination by the defendant.

(4) *Junior High Feeder Patterns.*

At the time of the original trial, Benton Harbor Junior High was identifiably Black; Fairplain Junior High was identifiably White; and Hull Junior High was racially unidentifiable. With the start of the 1970–71 school year major changes were made in junior high feeder and grade patterns. [180] At that time, all ninth grade students were transferred to the high school, which was put on half-day sessions. Five seventh and eighth grade centers were established at Benton Harbor Junior High, Fairplain Junior High, Hull School, Eaman School, and "old" Sorter School. Before the Board adopted these new feeder patterns it had reviewed four alternative plans submitted by Superintendent Lewis. [181] This memo stated on its cover:

> "Plans I and I(a) are an attempt to get the best racial balance in each school. Complete balance according to population percentage is impossible without cross-busing. No serious consideration has been given to cross-busing."

Plan I had feeder patterns resulting in the following Black/White percentages:

174. *See* Part V(A)(2)(C), *supra.*

175. PXR–40. *See* Part V(B)(7), *infra.*

176. PX–36

177. PXR–40.

178. PXR–6.

179. Elementary schools 90–100% Black had the following student-teacher ratios:

| School | Students per Teacher |
| --- | --- |
| Bard | 25.8 |
| Calvin Britain | 28.05 |
| Boynton | 25.30 |
| Columbus | 28.21 |
| Morton | 24.03 |
| King | 27.94 |
| Seely McCord | 23.41 |
| Sterne Brunson | 27.84 |

Elementary schools 0–25% Black had the following student-teacher ratios:

| School | Students per Teacher |
| --- | --- |
| Fairplain Northwest | 26.43 |
| Fairplain West | 22.25 |
| Johnson | 18.14 |
| Martindale | 20.44 |
| Millburg | 17.40 |
| Pearl | 22.00 |
| Sodus | 16.50 |
| Sorter | 21.29 |
| Spinks Corner | 19.00 |

180. PXR–38, –66, –82.

181. PXR–66.

Hull (58/42), Benton Harbor (65/35), Fairplain (25/75). Plan I(a) had similar percentages: Hull (58/42), Benton Harbor (62/38), Fairplain (30/70). Neither Plan I or I(a) included provision for separate 7/8 centers at Sorter and Eaman. Dr. Lewis noted that Plan I(a) "gives about as good a racial balance as it is possible to obtain without cross-busing."[182] Plan 2 included the Eaman and Sorter 7/8 centers and projected the following Black/White percentages: Hull (58/42), Benton Harbor (90/10), Fairplain (25/75), Eaman (0/100), and Sorter (5/95). The advantage to this plan, observed Dr. Lewis, was that it provided more room at Benton Harbor Junior High for implementation of Title I funds by letting students stay at Eaman and Sorter. The disadvantage was that:

"... some students would still not be getting the expanded program which the Junior High School can offer. This would be their choice, however. Any students living in those areas that wanted to attend Benton Harbor Junior High School could do so."

The final plan, Plan 3, proposed by the district's independent consultant, Dr. Englehardt, had all students attending the three main 7/8 centers and had the following Black/White student balances: Hull (65/35), Benton Harbor (70/30), and Fairplain (35/65).

The plan ultimately adopted by the Board was, with some modifications, Plan 2, which was the most segregative of the plans proposed.[183] North Shore-Lafayette-Eaman students were given their choice to stay at Eaman through eighth grade rather than attend Black Benton Harbor Junior High. These three areas were 95 percent White. Pearl-Sorter students were also given their choice to stay at Sorter through eighth grade rather than attend Black Benton Harbor Junior High. These two areas were 95 percent White. The only major changes made by the Board from Plan 2 which altered the racial make-up from that

projected were that students from a portion of the Boynton attendance zone (a school 84.6 percent Black) were assigned to Fairplain 7/8 center rather than Hull and that students from Sterne Brunson (48.2 percent Black) were transferred from Benton Harbor Junior High to Fairplain 7/8. These changes resulted in Hull being less Black (37.0 percent) and Fairplain being more Black (45.6 percent) than predicted. As expected, Benton Harbor 7/8 was 91.5 percent Black, Sorter 7/8 was 6.0 percent Black, and Eaman 7/8 was 4.3 percent Black.

By these actions the school board did in fact improve the racial make-up of Fairplain Junior High and make it racially unidentifiable. But by allowing students to remain at Sorter 7/8 and Eaman 7/8 centers rather than attend Black Benton Harbor Junior High, the Board exacerbated segregation at that school. As well might be expected, few Sorter or Eaman students opted to attend Benton Harbor Junior High. Plan 2 estimated those two schools would produce 283 seventh and eighth grade students (the estimations were high in all instances with the exception of the predicted enrollment at Benton Harbor). Attendance figures for the 1970–71 school year show a total of 219 students at these two schools, both of which were overwhelmingly White.[184] Additionally, the loss of the more than 50 percent White Sterne Brunson student body caused Benton Harbor to jump from 81.7 percent Black in 1969–70 to 91.5 percent Black in 1970–71.[185] The natural, probable, foreseeable, and actual consequence of this policy was to assure that Benton Harbor Junior High would remain a nearly all-Black school. It has remained so to the present time.

Eaman 7/8 was closed in April 1971, when that district was transferred to the Coloma School District. Lafayette (54.2 percent Black) and North Shore (56.3 percent Black) students now attend Hull 7/8.

---

182. *Id.* at 5.

183. PXR–82.

184. PXR–11, –12.

185. *Id.*

Sorter 7/8 remained open until the 1973–74 school year. Pearl (13.6 percent Black) and Sorter (7.1 percent Black) students now attend Fairplain Junior High.[186] The result of these changes is that Fairplain 7/8 is today racially unidentifiable; Hull 7/8 is identifiable as a White school, as that term is defined here; and Benton Harbor 7/8 remains almost entirely Black.[187] The Board has introduced no evidence of attempts made to reduce the segregation it has cuased at Benton Harbor Junior High.

The Board has failed to rebut the presumption that its intentional inaction in refusing to desegregate Benton Harbor Junior High was a purposeful and intentional act of segregation. This inference is bolstered by the fact that, at a time when the Board was rearranging junior high feeder patterns throughout the district, it took away from Benton Harbor an attendance area that was more than 50 percent White, thereby increasing the percentage of Black students at Benton Harbor well above the previous year. Finally, the Board's decision to give White students the option to remain at Sorter 7/8 and Eaman 7/8 had as its natural, probable, foreseeable, and actual result the continued segregation of Benton Harbor Junior High. The Board insured by its actions that few White students would attend Benton Harbor Junior High.

### (5) Portable Classrooms.

The evidence submitted in the 1970 trial indicated that 12 of 13 portable classrooms purchased by the district for its elementary and junior high schools were located at schools 80 percent or more Black. In each instance, the nearby White schools had available space to handle the Black school's overcapacity. The Board could have enhanced integration by transferring Black students to these undercapacity schools. The Board ignored this alternative and

chose, rather, to contain students at the overcrowded Black schools. The foreseeable and actual result of placing portables in this manner gives rise to a presumption of segregative intent. *NAACP v. Lansing Board,* supra, at 1051. This presumption was not rebutted at the trial on remand. I conclude that the policy was carried out with segregative intent.

Despite Board notice at the original trial that its portable classroom policies were under attack, the Board continues to pursue that policy in a manner indicating segregative intent.

Four additional portable classrooms were placed at Bard in the summer of 1970, bringing to nine the total number of portables there.[188] These rooms were presumably used to relocate Bard students who had been displaced during the 1969–70 school year when a large portion of Bard had to be razed because of its badly deteriorated condition.[189] This was done even though nearby schools (e. g., Hull—45.1 percent Black, Sorter—7.1 percent Black) had available space.[190]

The Board also located 5 portables at Columbus School in the years 1972 (four) and 1975 (one). This was a period when Columbus enrollment was growing drastically and becoming increasingly Black. The evidence shows the following grade adjustments, total students and percent Black at Columbus during this period: [191]

| Year | Grades | Total Students | Percent Black |
|------|--------|----------------|---------------|
| 1968–69 | K–6 | 255 | 49.8 |
| 1969–70 | K–5 | 257 | 59.5 |
| 1970–71 | K–3 | 245 | 68.9 |
| 1971–72 | K–3 | 287 | 86.4 |
| 1972–73 | K–3 | 307 | 93.5 |
| 1973–74 | K–3 | 325 | 96.3 |
| 1974–75 | K–3 | 329 | 97.3 |
| 1975–76 | K–3 | 340 | 97.9 |
| 1976–77 | K–3 | 370 | 99.5 |

As can be seen, enrollment at Columbus remained stable even though the upper

**186.** PXR–12, –38, –41.

**187.** PXR–6.

**188.** *See* Part V(A)(2)(G), *supra.*

**189.** PXR–43.

**190.** PX–36; PXR–11, –12.

**191.** PXR–11, –12, –38.

grades were gradually moved elsewhere and increased rapidly in the years since as the grade pattern remained constant. In 1970–71 even though grades 4 and 5 were moved to a new facility in the former Lake Michigan College Building, total enrollment dropped only twelve students. As enrollment increased, so did the percentage of Black students at Columbus. The placement of four portables at Columbus in 1972 and one in 1975 strongly suggests a Board desire to contain the increasingly Black student body at Columbus, despite available space at the nearby, identifiably White Fairplain schools, all four of which were substantially below capacity at the time.[192]

(6) *"Neighborhood School" Policy.*

■■■ As I have previously observed, the "neighborhood school" policy, which defendant has proffered as its defense in these proceedings, was so often departed from that it cannot be considered a firm and consistent goal of the Benton Harbor Board.[193] The evidence submitted before Judge Kent indicated that the use of student transfers, boundary changes, and grade pattern changes had the effect of continuing and increasing the segregated conditions in the Benton Harbor schools. Continuation of such a policy creates a presumption of segregative intent. *NAACP v. Lansing Board, supra,* at 1051. That presumption was not rebutted at the trial on remand.

The recent decline in enrollment, and the reduced overcrowding which has resulted, has permitted the district to reduce the crazy-quilt structure of grade patterns previously existent in the district. However, in a number of instances, students remain in attendance outside their "home" attendance areas.[194] The Lafayette-North Shore

unit remains merged, with K–3 students at Lafayette (54.2 percent Black) and 4–6 at North Shore (56.3 percent Black). With the loss of Eaman ⅞ Center to the Coloma School District, Lafayette-North Shore seventh and eighth grade students attend Hull ⅞ (43.9 percent Black). All three schools are identifiably White, as that term is defined here.[195]

Another merger of attendance zones occurred in the 1971–72 school year when the fourth through sixth grades of Columbus (86.4 percent Black) and Calvin Britain (90.6 percent Black) were transferred to a newly-opened facility at the former Lake Michigan College Campus (87.1 percent Black on opening).[196] This facility is within neither Columbus nor Britain attendance zones. As can be seen, both schools are identifiably Black.

The remaining instances of attendance outside of home boundaries occur at Sodus, Spinks Corner, and Stump Nickerson schools. Sodus (0.0 percent Black) area Kindergarten students attend Stump Nickerson (50 percent Black), while Sodus fifth and sixth graders attend Fairplain East (34.7 percent Black). Spinks Corner (0.0 percent Black) fourth through sixth graders attend class at Pearl (13.6 percent Black). Finally, Stump Nickerson fourth through sixth graders attend Fairplain East. Again, all these schools are racially identifiable, in this instance as white schools.[197]

■■■ As the Court of Appeals has recently stated in *NAACP v. Lansing Board*:

As a matter of general principle, assigning school children to schools in their neighborhoods does not offend the constitution. *See e. g., Higgins v. Board of Education,* 508 F.2d at 790; *Deal v. Cin-*

---

192. PX–36; PXR–11, –12.

193. *See* Part V(A)(2)(H)(3), *supra.* Cf. PXR–67, –68, –74–A–1, –75–A–1, –77, –78, –79, –82, and –83.

194. PXR–41.

195. *See* Appendix D. It may be unusual to think of a majority Black school as being identifiably White. However, were the district only

27.9 percent Black rather than 27.9 percent White, it would be easy to perceive that schools 45.8, 43.7, and 56.1 percent Black (the converse of the situation here) were identifiably Black.

196. *See* Part V(B)(7), *infra.*

197. PXR–12.

cinnati Board of Education, 419 F.2d 1387 (6th Cir. 1969); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966). Racial imbalance in the schools does not, in itself, establish a constitutional violation.[8] See Keyes v. Denver School Dis-

[8] It is, however, significant evidence of de jure segregation. See Washington v. Davis, 426 U.S. at 242 [96 S.Ct. 2040]; Village of Arlington Heights v. Metropolitan Housing Development Board, 429 U.S. at [266–267] 97 S.Ct. at 564.

trict No. 1, 413 U.S. at 212 [93 S.Ct. 2686.] See also Bronson v. Board of Education, 525 F.2d at 347. The Constitution imposes no duty on school officials to correct segregative conditions resulting from factors over which they have no control, such as residential patterns, and the failure to anticipate the effect on racial composition of the schools of adherence to a neighborhood school policy does not signify that a school board has created a dual system, absent a showing of segregative intent. Higgins v. Board of Education, 508 F.2d at 791. However, "the mere assertion of [a 'neighborhood school'] policy is not dispositive where . . . the school authorities have been found to have practiced de jure segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation."[9]

[9] The racial composition of neighborhood schools often influences residential patterns within the school district. Acts of de jure segregation "may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools." Keyes v. School District No. 1, 413 U.S. at 202 [93 S.Ct. at 2694.] See also Swann v. Board of Education, 402 U.S. at 20–21 [91 S.Ct. 1267].

Keyes v. School District No. 1, 413 U.S. at 212 [93 S.Ct. at 2699].

559 F.2d at 1049.

I conclude from the totality of the evidence before me that the transfer policies, boundary changes, and grade pattern changes

carried out by the Board actually resulted in the exacerbation of the racial segregation existent in the Benton Harbor public schools and that these actions were carried out by the Board with segregative purpose and intent.

(7) Opening of King School.

In the late 1960's and early 1970's, the enrollment at both Columbus and Calvin Britain schools was increasing rapidly. At the beginning of the 1971–72 school year, a new facility was opened in the former classroom building of Lake Michigan College.[198] This "College Building," later named Martin Luther King, Jr. School in a contest among its students, became the location for grades 4 through 6 of both Columbus and Calvin Britain schools.[199] This new facility, however, was not located within the attendance zones of either Columbus or Britain, but instead was within the attendance zone of Seely McCord School.[200] King School was set up, not as a temporary response to overcrowding, but as a permanent facility with set feeder patterns.[201]

It is significant that, as the enrollment of both Columbus and Britain increased, the percentage of Black students was also on the rise. Columbus, as noted earlier, had been a K–6 school. In 1969–70 it was reduced to a K–5 school. In 1970–71, it became a K–4 school.[202] Britain remained a K–6 school until 1971–72. These two schools showed the following enrollment and percentage of Black students for the following years: [203]

| | Columbus | | Britain | |
|---|---|---|---|---|
| Year | Enrollment | Percent Black | Enrollment | Percent Black |
| 1968–69 | 255 | 49.8 | 613 | 77.2 |
| 1969–70 | 257 | 59.5 | 667 | 83.2 |
| 1970–71 | 245 | 68.9 | 683 | 88.3 |
| 1971–72 | 287 | 86.4 | 448 | 90.6 |
| 1972–73 | 307 | 93.5 | 427 | 92.9 |
| 1973–74 | 325 | 96.3 | 430 | 95.3 |
| 1974–75 | 329 | 97.3 | 452 | 97.6 |
| 1975–76 | 340 | 97.9 | 476 | 98.1 |
| 1976–77 | 370 | 99.5 | 476 | 98.5 |

198. Troffer Testimony, R–Tr. 66–76.

199. PXR–38.

200. DXR–B.

201. Troffer Testimony, R–Tr. 68.

202. PXR–38.

203. PXR–11, –12.

King school was 87.1 percent Black on opening, with enrollment and percentage of Black students increasing as follows in succeeding years: [204]

| Year | Enrollment | Percent Black |
|------|-----------|---------------|
| 1971–72 | 418 | 87.1 |
| 1972–73 | 404 | 94.8 |
| 1973–74 | 450 | 95.4 |
| 1974–75 | 472 | 97.0 |
| 1975–76 | 462 | 97.8 |
| 1976–77 | 482 | 97.7 |

The Board was aware at the time of the grade pattern changes that both schools were racially identifiable and that the new school, of necessity, would be racially identifiable also.[205] As was noted earlier, a total of five portable classrooms were placed at Columbus during this same period to handle the increased enrollment.

■ At the time Martin Luther King, Jr. School was opened, nearby identifiably White schools had available space. Sorter (10.1 percent Black) was more than 100 students below its given capacity.[206] The Fairplain schools, East (10.1 percent Black), Northeast (25.4 percent Black), Northwest (2.3 percent Black), and West (4.9 percent Black) were, respectively, 124, 48, 30 and 136 students under capacity.[207] This evidence strongly suggests an intent on the part of the Board to contain the increasing and increasingly Black student bodies of Britain and Columbus schools at a Black facility rather than moving them to nearby White schools with available space. King cannot be justified as the result of adherence to a "neighborhood schools" policy as it is not even located within the attendance areas of the two schools it serves.

One indicium of system-wide de jure segregation is "the practice of building a school . . . to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school' . . . ." *Keyes, supra,* 413 U.S. at 201–02, 93 S.Ct. at 2694. The Board's decision to place the new facility in an almost entirely Black neighborhood, coupled with the Board's manifest intent to operate it as a neighborhood school, thus guaranteeing a student body over 85 percent Black, is significant evidence of de jure segregation. This was a deliberate act and, seen as part of a pattern of actions by the defendant, it proves segregative intent beyond question. Such action demonstrates the Board's intent to continue the practice of containing Black children in racially identifiable schools. *NAACP v. Lansing Board,* at 1055.

### (8) *Board Notice.*

During the pendency of these proceedings, and prior to their initiation, the defendant Board has had notice of the segregation existing within its schools. This notice has come from various segments of the community and from the State Board of Education. As early as the spring of 1967, the Board was presented with a position paper, prepared by the Michigan Conference of the NAACP and the Benton Harbor Branch of the NAACP entitled "De Facto School Segregation in Benton Harbor." [208] This report, authored by Dr. Robert L. Green of Michigan State University (who was later to be one of plaintiffs' expert witnesses at the 1970 trial), detailed the severe educational and psychological impact

204. *Id.*

205. Troffer Testimony, R–Tr. 68–70.

206. PX–36; PXR–11, –12.

207. *Id.*

208. PXR–55; DeFoe Testimony, R–Tr. 407–415. Defendants seized upon the title of this report as an "admission" that plaintiffs alleged only *de facto* and not *de jure* segregation was present in the Benton Harbor system in 1967. This is not so. The Report states at page 2:

"While the City of Benton Harbor has no legal code enforcing segregation in the public schools, its quasi-legislative bodies (the Board of Education and City Council) have fostered and widened the discrepancy by pursuing the policy of assigning Negroes to all-Negro schools. It is clear that this practice limits the Negro students basic right of freedom of choice and contributes to psychological conflict."

The report also attacked the district's purposeful *segregation of teaching personnel and the* disparate educational materials at Black and White schools.

segregated conditions have upon Black students. It also focused on student and faculty racial imbalance in Benton Harbor and the "lag" of Black students on achievement tests.

In December of 1970, the Board was presented with a list of demands from Black students, primarily concerned with the lack of Black teachers and Black counselors, and the general lack of respect for Black students in the district.[209] The Board response to those proposals recognized the need for more Black teachers and counselors and promised to work in that direction.[210] Additionally, the Board was aware of protests by Stump Alma and Morton parents over the inadequate educational materials at those two Black schools and was forced to demolish a portion of all-Black Bard School after a parent protest there.[211]

The Board also had considerable notice of the segregated conditions from the State Board of Education. One report identified the Benton Harbor schools as "racially isolated." [212] Another report on the Benton Harbor schools was the result of a request by BHASD Superintendent Lewis for a State Board of Education study team to visit the district for the purpose of making recommendations designed to improve the school district's ability to respond to school disorders. The request followed a disturbance by disenchanted Black students at Benton Harbor High School on January 15, 1971. The report spotlighted the many problems of the district, among them a changing racial population, the racial concentration in the schools, and the lack of Black teachers and administrators.[213]

#### (9) The Sodus II Transfer

The most thoroughly documented situation raised at the trial on remand was the

attempts of various portions of the defendant district to secede from the district, and the Board's change in policy with respect to those attempted property transfers. The Board's decision to stop opposing attempts to fragment the district into Black and White districts is probative of the Board's segregative intent.

Under the Michigan School Code, a county board of education may, in its discretion, detach property from one district and attach it to a contiguous district upon the petition of two-thirds of the resident owners of the land to be transferred. M.C.L.A. § 340.461. Only if the transfer involves more than 10 percent of the district's state equalized valuation (SEV) need the voters of the district losing property concur. *Id.* However, any property owner of the land considered for transfer, or any district affected by the transfer, may appeal the grant or denial of transfer by the county board to the State Board of Education. M.C.L.A. § 340.467. The appeal acts to hold the decision of the county board in abeyance until the State Board of Education (SBE) confirms, modifies, or sets aside the order of the county board of education. *Id.*

As the district's problems began to mount in the late 1960's, and the percentage of Black students continued to increase, residents of the outlying, White areas began to regret their earlier decision to join the consolidated school district. There were some individual and small group requests to transfer their properties to the Coloma Community School District or to the Eau Claire School District. These requests were generally opposed by the defendant Board and not approved by the Berrien County Intermediate School District (BCISD).[214]

**209.** PXR–51 at 15–16.

**210.** PXR–52.

**211.** *See* Part V(A)(2)(C), *supra.*

**212.** PXR–57 at 8.

**213.** *Id.* at 2–3, 6.

**214.** PXR–53 at 2–3. However, at least one such property transfer was approved by the

Despite this BHASD opposition,[215] the SBE on July 2, 1970, reversed the decision of the BCISD and, rejecting the recommendation of its own hearing officer and the State Superintendent of Public Education, John Porter,[216] approved the transfer of the Eaman area to the Coloma school district.[217] The Benton Harbor Board appealed for a rehearing,[218] but the SBE, again rejecting the recommendation of its hearing officer,[219] reaffirmed its decision to permit the transfer to Coloma.[220]

The impact this decision had on the defendant district was summarized in a January 26, 1971 communication from the BHASD to the SBE asking the State Board to "make public its position relative to requests for transfers of properties" from BHASD to contiguous districts.[221] The communication stated in part:

"The Board of Education of the Benton Harbor Area Schools made every attempt to inform the State Board of the precedent setting nature of such a decision, the harmful affects on the maintenance of racial balance, and the impact on the far reaching and exciting plans to improve the curriculum and physical plant of the District through implementation of at least part of a comprehensive study of the District conducted by the firm of Engelhardt and Engelhardt. Though communication was attempted by telephone, telegram and letters, all efforts to reach the State Board were rebuffed.

B. Subsequent to the Eaman decision, the Berrien Intermediate Board has been presented with petitions signed by some 1,600 persons in the St. Joseph Township portion of the District (Fair Plain Area) for transfer of their property to the St. Joseph School District. This is almost an all white area seeking transfer to a nearly all white school district.

C. Property owners in Pipestone Township filed for transfer but withdrew so that they could join a petition drive being conducted in Sodus Township for transfer to the Eau Claire District. Again, this is a predominantly white area asking for transfer to a predominantly white school district.

D. Widely circulated newspaper and radio accounts describe the petition campaign in Sodus Township for transfer to Eau Claire. The leader is quoted as saying, among other things, 'We feel the Intermediate District Board must take the new thinking of the State Board of Education on transfers—as shown in the Eaman case—into account when it considers our petition.'

Word has come of the circulation of transfer petitions in two other 'white' areas of the District as well.

E. Consolidation studies, subsequent study by a school district building planning committee, and the aforementioned Engelhardt Study, all pointed up the need for new secondary school spaces. This Board had reserved the date of March 8, 1971, as a time for a vote on a building program.

After word of the Fair Plain transfer move was received the Board, after careful consideration, decided not to proceed with a March election on a bond proposal.

F. It is obvious to this Board that racial tensions in the community have been increased by the proposed transfer of whites from the District.

How much these transfer requests have contributed toward the outbursts by black students at Benton Harbor High

BCISD, the approval later being reversed by the State Board of Education. Minutes of BHASD Board meeting, December 20, 1968. PXR–181.

215. PXR–189.

216. PXR–184.

217. PXR–182.

218. PXR–190.

219. PXR–186–A.

220. PXR–187.

221. PXR–53.

School on the morning of January 15, 1971, is pure speculation; however, the State Board should be aware that several thousands of dollars damage was incurred in what has been described as a planned mob action by black students at that institution.

The School District and the community are suffering in the aftermath of this event and the races are polarized as never before.

IV. Conclusions

The Benton Harbor Board of Education is seeking direction in the matter of coming to grips with the problems at hand. How can we plan effectively not knowing what the boundaries of the District might be six months hence and all that this uncertainty implies; the number of students to be served, the valuation of the District, school buildings available, bus routes to operate, personnel to employ, supplies and equipment to order, ad infinitum?

It is our belief that it is imperative that the State Board of Education make known its position with regard to transfer requests which may come before it from the residents of this District and essentially what its position will be on the maintenance of racial balance within the school district.

If transfers are permitted it is clear that Benton Harbor City, the majority of whose inhabitants are black, and the adjacent land areas where blacks are in the majority, will comprise the Benton Harbor Area School District."

Some 150 children were involved in this transfer, nearly all of them White, and they would join a 100 percent White Coloma school system.[222] The tax base loss was $2.5

million, approximately 1.4 percent of the district's total SEV.[223] The succeeding petitions for transfer involved approximately 25 percent of the district's SEV and 1500 of its students.[224]

This lengthy discussion of the impact the Eaman transfer had on the BHASD, both as to racial containment, and as to its continued cohesion, is made not to consider the liability of the SBE or the BCISD (which will be considered at a later time), but to show that the defendant Board considered the loss of even 1 percent of its SEV and 1 percent of its students as a disastrous loss, severely affecting the district's racial conditions. This opposition to property transfers continued until 1973.[225] At that time, a new petition by residents of the Sodus area was presented to the BCISD, seeking transfer to the Eau Claire School District. A previous petition by residents of the Sodus area (Sodus I) had been denied both by the BCISD and the SBE.[226] The Sodus I petition had, consistent with its previously announced policy, been opposed by the Benton Harbor Board.[227]

The Sodus II transfer request involved some 2.5 percent of the district's SEV and 143 children, of whom 79 percent were White.[228] (The Eau Claire district was 89 percent White for the 1973–74 school year.)[229] The Benton Harbor Board, at a special meeting on April 13, 1973, reversed its previous position against all property transfers and took the following action:[230]

"Mr. McDonald then read a statement and moved the following resolution:

In recognition of a petition presented to the Berrien County Intermediate School District by certain residents of the Sodus area, requesting a property transfer from the Benton Harbor Area School District to the Eau Claire School District,

**222.** PXR–186–B.

**223.** PXR–50.

**224.** *Id.*

**225.** PXR–58, –81, –87, –100, –188–A, –189, –190.

**226.** PXR–50.

**227.** PXR–58.

**228.** PXR–103 at 2.

**229.** PXR–279.

**230.** PXR–80.

the Benton Harbor Area School District Board of Education wishes to make the following statement and resolution:

The Board has studied the Sodus request at considerable length, and has given much consideration to its effect on the community in general and the Benton Harbor School District in particular. Coincident with this request, we have been presented with two plans for a redistricting of the Benton Harbor Area School District. The Board feels that, with some modification, these plans would provide a solution to many of the problems with which we are and have been confronted.

Accordingly, since the Sodus request for a property transfer to the Eau Claire School District is not inconsistent with a general plan for redistricting the Benton Harbor Area School District, which is imminent, the Benton Harbor Area School Board of Education does not oppose the Sodus Request for property transfer as indicated herein. I therefore move that the Superintendent and legal counsel be directed to attend the Sodus Hearing before the Berrien County Intermediate School District to present this statement and resolution and represent the Benton Harbor Area Schools Board of Education. In the event an appeal is filed from the decision of the Intermediate Board, the Superintendent and legal counsel are directed to represent this District's position. The motion was supported by Mr. Kampe. During the discussion on this motion, Mrs. Fox questioned the portion of the resolution regarding thorough discussion of this matter, asking when it was discussed by the Board in its entirety. Mr. Beland replied the Board had met last Monday night after the April 9 Board meeting.

The vote on the motion was:

AYES: Mr. Beland NAYS: Mrs. Fox
Mr. Culby
Mr. Kampe
Mr. McDonald
Mrs. Scott
Mr. Bentley

The motion carried."

The Sodus II transfer was granted by the BCISD on May 2, 1973 and approved by the SBE on July 3, 1974,[231] once again over the opposition of the SBE's hearing officer.[232] The implementation of the Sodus II transfer was enjoined by this Court, the injunction being upheld by the Court of Appeals.[233] The SBE subsequently reconsidered and vacated the Sodus II transfer.[234]

The decision of the Benton Harbor Board not to oppose the Sodus II transfer must be considered in the light of the continuing attempts by various factions in the district to divide the district into two new districts, one White and one Black. The Board action must also be considered in the light of the notice the Board had that the approval of the Sodus II transfer would increase racial segregation in the district and further exacerbate racial polarization in the district.

In response to the racial turmoil at Benton Harbor High School in January of 1971, and the increasing numbers of property transfer petitions being circulated, the intermediate board, with the approval of the BHASD Board,[235] appointed a "Blue Ribbon Committee" to study the problems of the Benton Harbor schools. The Benton Harbor Board saw the Committee's task as follows:

"FURTHER RESOLVED, that the committee be charged with the task of identifying the major problems which have created unrest and dissatisfaction in the Benton Harbor Area School District and proposing specific methods and/or actions to correct the problems.

231. PXR–50; PXR–102.

232. PXR–103.

233. *See* Part I, *supra.*

234. PXR–111.

235. PXR–285. Minutes of Special Meeting of the Board of Education, March 29, 1971.

Among the major problems three stand out: safety of students, development of each student to the maximum of his potential, and cultural differences so great as to hinder communication and thereby prevent the development of a 'community spirit.'

Among the possible actions for improving education in the Benton Harbor Area and throughout the county are:

1. Revamping district boundaries in a manner consistent with the requirements of State and Federal laws.

2. Expansion of programs for the educationally disadvantaged on a county-wide basis.

3. Development of guidelines for challenging academically talented and creative students all through their school experience, hopefully within the comprehensive school.

4. Development of a program of vocational education on a county-wide basis which would offer programs in a wide spectrum of vocational skills including both service and manufacturing occupations.

The Board will make available to the committee studies which have been completed since consolidation on student population projections, building and curricular master plans and public opinion surveys. The motion carried on a unanimous affirmative vote."

The Blue Ribbon Committee quickly passed beyond resolutions respecting educational equality in the district and concerned itself primarily with the question of "redistricting." The Committee saw the major questions before it as: [236]

"1. Stability of the entire Twin Cities area

2. Safety of children in school and community

3. Quality of education in the Benton Harbor district

4. Protection of the property values

5. How will the district be changed to solve the above problems?" [237]

The Committee voted 14 to 7 that redistricting was necessary to stop the exodus of families from the Benton Harbor area.[238] Unable to agree on any particular plan, the Committee in turn formed a redistricting study committee.[239] The assignment given the Redistricting Planning Committee (RPC) was:

"A. To communicate and consult with all groups concerning:

1. those wanting redistricting

2. the sending area

3. the receiving area

4. the Intermediate School District Board

5. the State Department of Public Instruction

B. To try to apply the Intermediate School District Board's guidelines so that an equitable opportunity may be given to the entire area to vote on such a request that will be:

1. satisfactory to those who wish to leave the district and will not result in great hardship on either

2. the sending district, or

3. the receiving district

In addition Ralph Lehman presented the Guidelines:

I. Can redistricting be within the present district?

II. The Board makes no recommendation for transfer of property; it does not ask that property be transferred

A. When petitioners come before the Intermediate School District Board with their requests:

1. Items to be considered:

a. Why is the transfer being requested?

b. What advantages would apply for those seeking transfer?

B. How would the transfer affect the "sending district"?

1. Would a genuine hardship result?

a. What financial changes would apply?

---

236. PXR–281, –282, –283, –290.

237. PXR–281 at 2.

238. PXR–282 at 5.

239. PXR–286 at 23.

2. How would its educational program be affected?

3. How would its racial pattern be affected?

4. How would its building program and equipment be affected?

5. What is the attitude of the Board of Education of the "sending district"?

C. How would the "receiving district" be affected:

1. Would a genuine hardship result?

a. What financial changes would apply?

2. How would its educational program be affected?

3. How would its racial pattern be affected?

4. How would its building program and equipment be affected?

5. What is the attitude of the Board of Education of the "receiving district"? [240]

A total of 13 redistricting plans were presented. The thirteenth plan was a "Federated District Plan" proposed by a University of Michigan consultant to the RPC. This plan would have required state enabling legislation and was not realistically considered as a solution to BHASD's immediate problems. The remaining twelve plans proposed to the RPC were reviewed by the Michigan Civil Rights Commission.[241] Only one plan (to merge BHASD with the St. Joseph and Lakeshore districts) was perceived as immune to court challenge under the 14th Amendment. The remaining eleven plans involved breaking up the existent Benton Harbor District and annexing suburban and rural areas to neighboring White districts. Of these eleven, seven would create school districts 75 percent Black; eight would create White districts with an SEV of twice that of the remaining Black district; and all eleven would benefit White students to the detriment of at least 90 percent of the Black students.[242] For instance, Plan 4 envisioned a central district 86 percent Black with an SEV of $11,250 per pupil. By contrast, the proposed "north" district would be 92 percent White with a per pupil SEV of $19,000 and the proposed "south" district would be 90 percent White with a per pupil SEV of $29,000.[243] The remaining plans reached similar results.

The committee could not agree on adoption of a particular plan. It submitted four plans to the BCISD and the SBE. Of these, one was the "federated" district plan and another the "regional" (merger with White districts in northern Berrien County) district plan. Concededly, neither of these two plans had much chance of immediate success, the former requiring enabling legislation,[244] and the latter requiring a majority vote in the districts involved—a rather unlikely occurrence. The two other plans submitted had racially isolated "central" districts with a much lower SEV than the surrounding White districts, one of them being Plan 4 detailed above.[245]

One additional plan presented to the Board by representatives of various suburban and rural factions amounting to several thousand persons (from Fairplain West, Northwest, and East, North Shore-Lafayette, North Shore-South Eaman, and Millburg) took no pains to conceal the fact that it was drawn along racial lines:

"We, the undersigned, representatives of various groups of the rural and suburban areas of the Benton Harbor School District have been studying the problem of redistricting of the Benton Harbor Area Schools. We herewith petition the Benton Harbor School Board to use its authority under the Michigan laws to petition the Berrien County Intermediate School District to place a redistricting plan before the citizens of the Benton Harbor Area School District for a vote.

---

240. PXR–287 at 2.

241. PXR–288.

242. *Id.*

243. *Id.*

244. PXR–289.

245. PXR–288.

We are enclosing with this letter a map showing a division of the school district into two parts. The map, you will notice, generally follows the boundary of the City of Benton Harbor plus that part of Benton Township in the Model Cities Area. We are advised that this can be done within the framework of the presently existing law.

We have studied the report of Dr. Kehoe and his associates, the Blue Ribbon Committee, and the Redistricting Committee created by the Berrien County Intermediate School Board at the request of the Benton Harbor School Board in recognition of the many problems dividing the Benton Harbor Area School District; and have discussed the matter with interested citizens and school officials.

The plan we propose calls for combining the area outside the Model Cities Area to the existing K–8 districts of Riverside and River. Our studies indicate that the plan is economically feasible particularly in view of the recent court decisions requiring more equitable school financing in this State.

Your Board may wish to make some variations in this plan before you petition the Intermediate Board for an election. It is our understanding, however, that this plan represents an acceptable alternative for most of the rural and suburban population.

We note that this plan is somewhat similar to another plan recently referred to by one of the Benton Harbor City Commissioners and supported, according to him, by petitions presently being circulated throughout the City of Benton Harbor.

With appeals coming from both the City and suburban-rural areas, it is, we feel, the duty of the Board of Education to petition the Intermediate School District for division of the district into two smaller districts that would be more responsive to the individual needs of the citizens in these districts. We ask that you proceed promptly with this matter so that it can be brought to a vote of all the people in the Benton Harbor Area School District." [246]

Although the supporters of this plan stated it was consistent with "court decisions requiring more equitable school financing in this State," the SEV of the proposed Black district (88 percent Black) was $12,000 per pupil and that in the White district (81 percent White) was $23,580 pupil. This plan had as its priorities:

"(1) To create district boundaries which will be supported by their respective constituents.

(2) To improve the opportunities for achieving higher student performance.

(3) To create a more compatible and harmonious organization of student balance with respect to educational goals, social values and student interests."

If it is true that there are known limits to sustain an integrated school system of good quality, then change is called for. If the city residents seek another direction, then change is called for. We urge the Board to prepare a plan to be submitted to the voters of the Benton Harbor Area School District based along the lines of this statement and the accompanying general plan." [247]

This plan was a blatant call for separate and unequal White and Black school districts.

Throughout this period of time, the Board was kept on notice by public statements of the Twin City Area NAACP, the Mayor of Benton Harbor, the Benton Harbor City Commission, the Benton Harbor/Benton Township Housing Commission, and the Township of Benton that the transfer attempts and redistricting plans were transparent attempts to establish segregated school districts out of the BHASD. [248]

---

246. PXR–84 at 2.

247. *Id.* at 4.

248. PXR–104, –105, –106, –107, –161, –166.

The action of the Board in reversing its previous position of opposition to any and all transfers of property out of the district must be considered as part of a larger picture in which constant and concerted attempts were being made to establish one central all-Black district and separate surrounding all-White districts. As the Board resolution approving the Sodus II transfer stated:

> "Coincidental with this request, we have been presented with *two* plans for a redistricting of the Benton Harbor Area School District. The Board feels that, with some modifications, these plans would provide a solution to many of the problems with which we are and have been confronted." (Emphasis added.)

Of the redistricting plans before the Board, the only two consistent with the Sodus II transfer were those envisioning a Black "central" district and one or more White suburban districts.

With regard to the Board decision to approve the Sodus II transfer, no inference of segregative intent need be drawn. On its face, the Board decision was a purposeful action which had as its ultimate goal the dismantling of the Benton Harbor Area School District into separate, unequal, Black and White districts.

## VI. *Conclusion.*

As I have discussed more fully above, I am here applying the test of liability announced in *Oliver v. Michigan State Board of Education,* supra, and recently reaffirmed in *NAACP v. Lansing Board of Education,* supra:

> "A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools. A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes

proof unless defendants affirmatively established that their action or inaction was a consistent and resolute application of racially neutral policies." (Footnote omitted.) 508 F.2d at 182.

I find defendant, Benton Harbor Area School District, guilty of acts of de jure segregation. In addition to the defendant's failure to rebut the presumption of segregative purpose, there were other actions carried out by the defendant which cannot be explained except by ascribing to them a deliberate, conscious intent on the part of the Board to segregate public school pupils on the basis of race.

The evidence before me leads me to the conclusion that the actions and inactions of the Benton Harbor Area Board of Education, carried out with segregative intent, proximately caused the segregation existing in the Benton Harbor public schools today. The Board's acts and omissions played a substantial part in bringing about or actually causing the constitutional violation found here today. The Board's purposeful acts and omissions directly resulted in the segregation of Benton Harbor students and the terrible injuries that flow therefrom. The Board's actions also set the stage for the exodus of White families from the district to the extent that the district is nearly 75 percent Black at this time.

Sadly, I must concur with the opinion of plaintiffs' expert who stated during the trial before Judge Kent:

> "[I] served as the education director of the Southern Christian Leadership Conference, and I have had opportunity to look at school districts all over the South and in many Midwestern and Northern school units, and on the basis of the data that I have observed from the Benton Harbor School District here in the state of Michigan, equal educational opportunity is not afforded black children in contrast to their peers. . . . [T]he educational sequence or sequences provided for black children in Benton Harbor is only paralleled by some school districts that I have been able to view . . . in many Southern communities, which

are looked upon as being depressing for black children." [249]

The plaintiffs in this case have proven the existence of a dual school system in Benton Harbor:

"This is not a case . . . where a statutory dual system ever · existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system." *Keyes,* supra, 413 U.S. at 201–02, 93 S.Ct. at 2694.

Thus, the defendant Benton Harbor Board of Education is clearly charged with "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green,* supra, 391 U.S. at 437–38, 88 S.Ct. at 1694. The Court in *Green* admonished that " 'the time for mere "deliberate speed" has run out' . . . The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now.*" (Emphasis in original.)

As in any school desegregation cases where violation of the Fourteenth Amendment has been found, the primary responsibility for providing a remedy lies with school authorities. The present School Board had numerous opportunities to terminate the litigation by voluntarily integrating the Benton Harbor public schools. Instead of resolving the matter themselves, the Board members chose to pursue the litigation and force the court to decide the hard issues involved.

Their decision to continue this action may have been based upon the erroneous premise that "there are no schools in this system where an ethnically-imbalanced student population has resulted from an act of de jure segregation." Since this premise has been demonstrated false, it is reasonable to assume that the Board would want to re-examine its decision not to take any action to remedy the racial segregation in the Benton Harbor schools. Now that the Board's responsibility for the segregated conditions in the Benton Harbor schools is established beyond question, the court hopes that it will work diligently with the school administration to devise a plan which will eliminate all vestiges of illegal discrimination from the Benton Harbor Area School District.

Such plans must consider many variables, and are best framed by those intimately familiar with the daily operation of the school system. The court may refer plans submitted by the parties to an expert for evaluation. If necessary, the expert will also be asked to revise or supplement the proposed plans. The proposal should originate with the Benton Harbor school officials or citizens. The court has regularly reminded the parties that the primary obligation of administering the school system lies with the local school board; federal courts enter the picture only when the local board fails to carry out its obligations.

---

**249.** Green Testimony, Tr. 540.